**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**ALAMEDA GATEWAY LTD.,**
**Defendant–Appellee.**

**No. 99–15642.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 2000

Filed May 26, 2000

Diane D. Hastert, Damon Key Leong Kupchak Hastert, Honolulu, Hawaii, for the defendant-appellant.

John T. Stahr, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: GOODWIN, BRUNETTI, and THOMAS, Circuit Judges.

BRUNETTI, Circuit Judge:

Alameda Gateway ("Gateway") appeals the district court's grant of summary judgment in favor of the Army Corps of Engineers ("Corps") and its denial of Gateway's cross-motion for summary judgment. The Corps removed portions of Gateway's piers pursuant to its authority under section 10 of the Rivers and Harbors Appropriation Act of 1899 ("RHA"). *See* 33 U.S.C. § 403. Gateway's piers were located in the Oakland Harbor ("Harbor") and were removed in order to create a turning basin that would improve accessibility for larger vessels and consequently increase the volume of cargo entering Oakland. *See* Water Resources and Development Act of 1986 § 202, Pub.L. No. 99–662, 100 Stat. 4082, 4092 ("WRDA").

The Corps sued Gateway in federal district court to recover the costs associated with the removal, claiming that the RHA furnished it with a removal and reimbursement remedy. The district court agreed and granted summary judgment in favor of the Corps. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I.

Gateway owns a 29–acre marine industrial site on the Alameda side of the Oakland Harbor. When Gateway acquired the property in 1983, it acquired two piers, an eastern and western pier, each extending approximately 600 feet into the Harbor. The western pier stands on both the submerged parts of Gateway's property and on submerged land leased to Gateway by the City of Alameda. The eastern pier stands entirely on submerged portions of Gateway's property and is badly deteriorated.

Most of Gateway's property that lies within the proposed turning basin was originally conveyed into private ownership by Governor Pablo Vicente de Sola of California, acting under the authority of the Spanish Government in 1820. The property was conveyed to the Peralta family as part of the Rancho San Antonio. The United States agreed to honor private land grants, including the grant made to the Peralta family, in the Treaty of Guadalupe Hidalgo.

The property then changed hands several times until it was purchased by United Engineering Company ("United") prior to World War II. Between 1941 and 1943, United dredged the property to create a basin. Shortly after the dredging work was completed, United constructed the two piers without a permit. These piers are the subject of this appeal. The United States then took title to the piers and leased them to United.

In 1970, the United States sold its interest in the property, including the two piers, to Todd Shipyard Corporation ("Todd"). Gateway purchased the property from Todd thirteen years later. Shortly after purchasing the property, Gateway applied to the Corps for a permit to develop a marina. The application was denied because the Corps had already started to make preparations with the Port of Oakland ("Port") to create the turning basin. Gateway sued the Corps in federal district court to compel the issuance of a development permit, but no decision was ever reached in that case.[1]

In 1986, Congress, among other things, authorized the construction of the proposed turning basin by passing the WRDA. *See* WRDA § 202, Pub.L. No. 99–662, 100 Stat. 4082, 4092. Prior to the project, the Harbor was unable to accommodate larger vessels except during high tide and when the ships were not fully loaded. The purpose of the project, therefore, was to make the Port competitive by deepening and widening the shipping channels in addition to providing a turning basin for larger ships.

The Corps determined that it would need to remove portions of Gateway's piers in order to create a safe turning basin. As a result, the Corps moved the harbor line shoreward and notified Gateway that the piers were an obstruction to navigation and that Gateway needed to submit a plan to remove the piers at its own cost. *See* 33 U.S.C. §§ 403, 406. Gateway refused to submit a removal plan, and the Corps decided to remove the piers on its own in order to keep the project on schedule.

The United States initiated this action by filing a motion in federal district court for an injunction preventing Gateway from interfering with the removal of the piers. The district court granted that motion and the pier ends were subsequently removed by the Corps. Following the removal, the Corps filed a motion for summary judgment, arguing that Gateway was responsible for the $1,677,186.08 in demolition and removal costs paid by the Corps. Gateway opposed the motion and filed a cross-motion for summary judgment. The district court granted summary judgment in favor of the United States and awarded removal costs. Gateway's cross-motion was denied and this appeal followed.[2]

## II.

 Ordinarily, the denial of summary judgment is not a final order and is thus unappealable. *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1482 n. 20 (9th Cir.1988). However, an order denying summary judgment is reviewable, as here, when it is coupled with a grant of summary judgment. *See id.*

This Court reviews both a denial and grant of summary judgment de novo. *See DeBoer v. Pennington*, 206 F.3d 857, 863 (9th Cir.2000). In reviewing an order denying or granting summary judgment, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 (9th Cir.1999).

---

1. Following the denial of the development permit, Gateway applied for a maintenance permit to work on the badly deteriorated eastern pier. The Corps agreed to grant the permit but only if Gateway consented to removal of the eastern pier once the Corps was prepared to begin the dredging work for the turning basin. Gateway elected not to perform the maintenance work until the dispute with the Corps was resolved.

2. Following the removal of the piers, Gateway filed a Fifth Amendment takings claim against the United States in the Court of Federal Claims ("CFC"). *See Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757, 761 (1999). In granting partial summary judgment to the United States, the CFC found that part of Gateway's property was burdened by the navigational servitude and that the United States did not need to compensate Gateway for taking those portions. *See id.*

### III.

■ The power of the United States to regulate navigable waters is grounded in the Commerce Clause of the Constitution. *See* U.S. Const. art. I, § 8, cl. 3; *Boone v. United States,* 944 F.2d 1489, 1493 (9th Cir.1991). This power is extremely broad, *see Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 385–86, 19 L.Ed.2d 407 (1967), and can include regulation over waterways which are no longer navigable (but once were) and waters which were never navigable but may become so with reasonable improvements. *See Boone,* 944 F.2d at 1495.

Pursuant to its regulatory authority over navigable waters, Congress enacted the River and Harbors Appropriation Act of 1899. *See* 33 U.S.C. § 401 *et seq.* The first clause of section 10 of the RHA prohibits the creation of any obstructions in navigable waters. *See* 33 U.S.C. § 403. It states: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited." *Id.* As the Corps readily admits, its sole remedy lies in this first clause of section 10. The focus of this appeal, therefore, is the breadth of the remedy provided by section 10.

### A.

■ The first issue is whether Gateway's piers constituted an "obstruction" under section 10 of the RHA. In *Sierra Club v. Andrus,* 610 F.2d 581 (9th Cir. 1979), *rev'd on other grounds,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), this Court held that any of the structures or activities listed in clauses two or three of section 10 are presumed to be obstructions. *See id.* at 596. The building of a pier, among others, is one of the activities expressly prohibited by the second clause of section 10. *See* 33 U.S.C. § 403. Un-

der *Andrus,* therefore, Gateway's piers are presumed to be an obstruction.

■ The evidence in the record supports rather than rebuts the presumption that Gateway's piers were an obstruction to the navigable capacity of the Harbor. The Corps expressly determined that portions of Gateway's piers prevented the creation of a turning basin that could safely accommodate larger vessels entering the Harbor, providing support for the Corps' election to remove the piers under section 10. Gateway fails to rebut the presumption or present any evidence to the contrary. The district court, therefore, correctly concluded that the piers constituted an obstruction under section 10 of the RHA.[3]

### B.

■ Gateway's primary argument is that a removal and reimbursement remedy is available to the Corps only when one of three conditions is met: (1) The piers were within the navigational servitude; (2) the piers were built pursuant to a permit issued by the Corps; or (3) Gateway was culpable. We disagree.

The starting point for our analysis is section 12 of the RHA. *See* 33 U.S.C. § 406. That provision states: "[T]he removal of any structures or parts of structures erected in violation [of section 403] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist." *Id.* While the statutory text of section 12 allows the Corps to seek an injunction to compel the removal of structures violating section 10, it conspicuously omits any reference to a removal and reimbursement remedy in favor of the United States. Thus, if such a remedy exists, it must be implied.

Supreme Court precedent suggests that the Corps may perform the removal work

---

**3.** Gateway concedes that the piers lie within the "navigable capacity of any of the waters of the United States." 33 U.S.C. § 403.

Thus, it is unnecessary for this Court to address that issue.

itself and then collect the costs of such work from private parties even though the RHA does not expressly authorize such a remedy. The Supreme Court has discussed the applicability of a removal and reimbursement remedy under the RHA, though the remedy has not been applied to a violation of section 10. We do not find that distinction significant, however, because the Supreme Court has repeatedly stated that the statutory remedies in the RHA are not exclusive.

In *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), the Supreme Court expressly stated that the remedies listed in section 12 are not exclusive. *See id.* at 491–92, 80 S.Ct. 884. It declared: "[Congress] has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation." *Id.* at 492, 80 S.Ct. 884. In *Republic Steel*, the Supreme Court held, consistent with its general observation about the nonexclusivity of statutory remedies under the RHA, that the United States may compel a private party to remove industrial solids even though the statute only allows a district court to issue injunctions for the removal of "structures." *See id.* Otherwise, the Court noted, the purposes of the RHA would be thwarted. *See id.*

The Supreme Court reinforced its willingness to imply additional remedies into the RHA in *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). In *Wyandotte Transportation Company*, the United States removed a sunken craft after Wyandotte, the owner of the vessel, refused to remove the craft itself. *See id.* at 195, 88 S.Ct. 379. The United States removed the vessel under section 15 of the RHA, *see* 33 U.S.C. § 409, which makes it unlawful to negligently sink a vessel in a navigable channel. The Court first noted that section 15 expressly states that it is the owner's duty both to mark a sunken vessel with a buoy and then either to remove or

to abandon it. *See id.* at 198, 88 S.Ct. 379. Despite the statute's clear declaration outlining an owner's duties, the Supreme Court nonetheless held that a party who negligently sinks a vessel should not be shielded from personal responsibility by merely declaring its craft abandoned. *See id.* at 200, 88 S.Ct. 379. Instead, the Court implied a self-help removal and reimbursement remedy in favor of the United States. *See id.* at 204, 88 S.Ct. 379.

*Wyandotte Transportation Company* is particularly significant because section 15 does not even authorize an injunctive remedy in favor of the United States. *See id.* at 199, 88 S.Ct. 379. Despite the absence of an injunctive remedy in the statutory text of section 15, the Court went a step further by not only implying an injunctive remedy, but also a self-help removal and reimbursement remedy in favor of the United States. In fact, the Court implied the self-help remedy under section 15, requiring Wyandotte to pay the removal costs despite its previous declaration abandoning the vessel, thereby supplementing the statutory text which, by its plain language, allows an owner to abandon its vessel. *See* 33 U.S.C. § 409.

The reasons for implying a self-help remedy for violations of section 10 are even more pronounced. In contrast to section 15, section 12 expressly provides for an injunctive remedy allowing the United States to compel an owner to remove an obstruction. When injunctive relief is already available, the case for implying a self-help remedy is even stronger. *See United States v. Perma Paving Co.*, 332 F.2d 754, 758 (2d Cir.1964). The Second Circuit recognized in *Perma Paving* that a self-help remedy is incidental to injunctive relief because the Corps should be able to effectuate immediate removal of an obstruction rather than resort to the much slower injunctive processes of the court system. *See id.* In many cases, the Corps has more expertise in removing an obstruction and even more importantly, a self-help remedy assures the United States

a speedy and competent remedy when a prompt removal is in the best interests of commerce, safety, or national defense. *See id.* This observation especially rings true where, as here, the Corps requested that Gateway remove the obstruction and that demand was firmly refused.

Although the authority is scant with regard to the availability of a removal and reimbursement remedy, the two cases that have considered the issue have reached the conclusion that such a remedy is available for violations of section 10. *See id.; United States v. Illinois Terminal R.R. Co.,* 501 F.Supp. 18, 21 (E.D.Mo.1980). In line with existing authority, we agree that there is a self-help remedy implied into sections 10 and 12 of the RHA. In addition, *Wyandotte Transportation Company* and *Perma Paving* illustrate that the availability of this remedy is premised solely on a violation of section 10, and that any further showing by the Corps is unnecessary.

Furthermore, Gateway's assertion that the Corps cannot remove a lawfully erected structure is equally unavailing. As the district court pointed out, the RHA allows the United States to remove structures that were once erected lawfully but subsequently found to be obstructions. *See, e.g., Greenleaf–Johnson Lumber Co. v. Garrison,* 237 U.S. 251, 263–65, 35 S.Ct. 551, 59 L.Ed. 939 (1915) (noting after surveying Supreme Court case law that even though a state may make a legal and binding grant to a riparian owner, Congress still has the power to remove structures under the Commerce Clause).

### IV.

Gateway next argues that the Corps failed to follow its own regulations when it removed Gateway's piers. *See* United States Army Corps of Engineers, Engineering Regulation 1165–2–131 § 11(d), at 31 ("Engineering Regulation"). Specifically, Gateway points to section 11(d)(6) of the Engineering Regulation which requires that two prerequisites be met prior to the exercise of "federal authorities": (1) the local sponsor fails to reach an agreement with the owners of the property de-

spite every reasonable effort; and (2) the local sponsor lacks the power to force the owners to give up their property. *See id.* Gateway alleges that the second condition was not met because the City of Alameda had the power to condemn Gateway's property and therefore the Corps' exercise of its RHA authority was premature. We need not reach that issue, however, because the Engineering Regulation is not binding on the Corps.

### A.

█ Although the parties failed to raise the issue in either the briefs or the district court, our case law is clear that "we will not review allegations of noncompliance with an agency statement that is not binding on the agency." *Western Radio Servs. Co. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996). In *Coleman v. Perrill,* 845 F.2d 876, 879 (9th Cir.1988), we suggested that an agency's compliance with a nonbinding regulation is a jurisdictional question, which requires us to raise the validity of the Engineering Regulation sua sponte on appeal. *See In re Exennium,* 715 F.2d 1401, 1402 (9th Cir.1983).

Furthermore, the Supreme Court has recognized that a court of appeals does not abuse its discretion when it raises the validity of a law even when the parties failed to raise the issue in the briefs or before the district court. *See United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.,* 508 U.S. 439, 448, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993); *see also Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 383 n. 3, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (discussing *National Bank of Oregon* ). The Supreme Court carved out an exception to the general rule of waiver by stating "that the Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law." *National Bank of Oregon,* 508 U.S. at 448, 113 S.Ct. 2173. In *Lebron,* the Supreme Court implied that the Court of Appeals not only failed to commit reversible error by rais-

ing the validity of a statute on its own initiative, but the Court actually approved of such a practice. *See Lebron,* 513 U.S. at 383 n. 3, 115 S.Ct. 961. This case is similar to *Lebron* and *National Bank of Oregon* because we face the unsavory prospect of reviewing a regulation that may not have the force of law and which our case law specifically precludes us from reviewing. Because *Espy* and *Coleman* clearly preclude appellate review of an agency's noncompliance with a non-binding regulation, the validity of the Engineering Regulation must be examined on appeal.

**B.**

For a regulation to have the force and effect of law, it must: "(1) Prescribe substantive rules-not interpretive rules, general statements of policy or rules of agency organization, procedure or practice-and; (2) conform to certain procedural requirements." *United States v. Fifty–Three Eclectus Parrots,* 685 F.2d 1131, 1136 (9th Cir.1982). While the Corps labeled the statement as an Engineering Regulation, an agency's characterization is not dispositive. *See Mt. Diablo Hosp. Dist. v. Bowen,* 860 F.2d 951, 956 (9th Cir.1988). Rather, this Court must examine the statement by applying the test set forth in *Eclectus Parrots* in order to determine whether the Engineering Regulation is binding. Without considering the second requirement in *Eclectus Parrots,* it is clear that the Engineering Regulation is not binding on the Corps because it is a general policy statement rather than a substantive rule.

For a rule to be labeled as substantive rather than interpretive, "the rule must be legislative in nature, affecting individual rights and obligations." *James v. United States Parole Comm'n,* 159 F.3d 1200, 1206 (9th Cir.1998). The starting point for determining whether the Engineering Regulation is substantive is its text. The purpose section of the Engineering Regulation states: "This Engineer Regulation provides *guidance* on procedures and responsibilities for developing, submitting, and obtaining approval of Lo-

cal Cooperation Agreements (LCAs) for specifically authorized new construction starts." *See* Engineering Regulation § 1, at 1 (emphasis added). The text of this section indicates that the Engineering Regulation is merely a general policy statement to guide district engineers in negotiating Local Cooperation Agreements for WRDA projects. It was not intended to create substantive rights in third parties (such as Gateway) or to paralyze the Corps by conditioning the exercise of RHA authority on the satisfaction of several requirements by the local sponsor. Rather, the Engineering Regulation memorializes the general policy behind the WRDA—to ensure that local sponsors make every attempt to acquire property before federal resources are employed. Furthermore, the Engineering Regulation was not published in either the Code of Federal Regulations or the Federal Register, providing further evidence that the regulation was not intended to be binding. *See Espy,* 79 F.3d at 901.

Accordingly, Gateway cannot rely on the Engineering Regulation because it was not intended to have the force of law, but was instead a policy statement to guide the practice of district engineers. *See James,* 159 F.3d at 1206 ("It is well settled that internal policy manuals of federal agencies do not generally create due process rights in others"); *Espy,* 79 F.3d at 901 (finding that the Forest Service Manual merely established guidelines for the exercise of the Service's prosecutorial discretion, making it an interpretive rather than substantive rule).

**V.**

Gateway's final contention on appeal is that it was denied due process because it was ordered to destroy its own property. Gateway presents this argument in a lone footnote and fails to cite any authority in support. Indeed, it is difficult to determine the type of due process violation that Gateway is alleging. Accordingly, Gateway has waived this issue on ap-

peal. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir.1999); *In re Worlds of Wonder Sec. Litigation*, 35 F.3d 1407, 1424 (9th Cir.1994).

**AFFIRMED.**