**Jay P. KELLY, Plaintiff,**

v.

**KEYSTONE SHIPPING COMPANY, Defendant.**

**No. CIV.A. 01CV11498MBB.**

United States District Court,
D. Massachusetts.

July 14, 2003.

Joseph G. Abromovitz, Boston, MA, for Jay P. Kelly, Plaintiff.

Seth S. Holbrook, Holbrook & Murphy, Boston, Brian B. Kydd, Kneeland & Kydd, Arlington Heights, MA, for Keystone Shipping Company, Defendant.

## MEMORANDUM AND ORDER RE: PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE APPLICABILITY OF 45 U.S.C. § 53 THEREBY BARRING ANY ASSESSMENT OF THE PLAINTIFF'S COMPARATIVE NEGLIGENCE (*DOCKET ENTRY # 76*)

BOWLER, United States Chief Magistrate Judge.

Pending before this court is the issue of whether to reduce the jury's verdict by the 45% contributory fault of plaintiff Jay P. Kelly ("plaintiff" or "Kelly") assessed by the jury. During trial and prior thereto, plaintiff argued that 45 U.S.C. § 53 ("section 53") of the Federal Employers' Liability Act ("FELA") precludes any reduction of a jury verdict based on plaintiff's negligence. Section 53 authorizes a reduction in damages based on a plaintiff's contributory negligence except in cases where the defendant/employer's violation of "any

statute enacted for the safety of employees contributed to" the plaintiff's injuries. 45 U.S.C. § 53. Plaintiff relies on 46 C.F.R. § 12.13–1 (1999), which prescribes training requirements for persons designated to take charge of medical care on board a ship, as the safety statute violated by defendant and a policy letter promulgated by the Commanding Officer of the United States Coast Guard ("the Coast Guard") on December 3, 1999, discussing such training.

Plaintiff initially raised the issue of the bar against the defense of contributory negligence under section 53 in the first supplement to the joint pretrial order (Docket Entry # 35). Defendant Keystone Shipping Company ("defendant" or "Keystone") consistently opposed any such reduction. After conducting an evidentiary hearing prior to trial,[1] this court concluded that the issue of whether Keystone designated Charles Hoerr Mayes, Jr. ("Mayes"), Second Mate aboard the S.S. Keystone Texas ("the Keystone Texas"), as a person in charge of medical care was an issue of fact for the jury. After further argument and briefing, on May 2, 2003, this court issued a ruling during trial that 46 C.F.R. § 12.13–1 (1999) grandfathered Mayes' training and licensing requirements and, consequently, he possessed the required training and licensing at the time of the January 2000 incident.[2] Adopting plaintiff's argument based on the policy letter, however, this court concluded that the policy letter allowed for the voluntary designation of a person to take charge of medical care by practice or company policy.[3] As plaintiff repeatedly argued, the policy letter "raised the bar" by requiring additional and immediate implementation of the STCW licensing requirements for a

---

**1.** This court has not summarized the testimony from the evidentiary hearing. Nonetheless, this court has fully considered such testimony including Timothy O'Connor's testimony that, before the middle of 2000, only Maine Maritime Academy offered an advanced medicine course meeting the person in charge of medical care requirements.

**2.** There is no dispute that Mayes was in seagoing service prior to August 1, 1998, and therefore grandfathered *if* grandfathering applies to 46 C.F.R. § 12.13–1 (1999). If grandfathering does not apply, Mayes lacked the necessary training and endorsement as a person designated to take charge of medical care.

The regulation expressly mandates compliance with the competency standards set out in the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 ("STCW"). The United States became a signatory to this treaty on February 1, 1997. At the April 24, 2003 hearing, Keystone stipulated that the Keystone Texas was subject to STCW.

In January 2000, Mayes held a valid STCW endorsement issued on August 8, 1996, to serve as a master of vessels of not more than 1,600 gross tons and as an "officer in charge of a navigational watch (second mate)." (Docket Entry # 75, Ex. 2). The endorsement also allowed Mayes to serve in the capacity of "rating forming part of a navigational watch" and noted Mayes' proficiency "in the use of survival craft." (Docket Entry # 75, Ex. 2). The STCW certificate was valid for a five year period. (Trial Ex. 16). It does not contain the requisite endorsement that Mayes attended a course meeting the standards of competency for seafarers designated to take charge of medical care. Defendant proffered no other evidence that Mayes had attended a course of training sufficient to meet the competency standards of STCW as a person designated to take charge of medical care. Rather, as of January 2000, Mayes had only completed a basic safety course in elementary first aid sufficient to meet the competency requirements set forth in Table A–VI/1–3 of the STCW Code. The STCW Code, incorporated by reference in the Code of Federal Regulations, details the necessary level of knowledge and competence for a person designated to take charge of medical care in Section A–VI/4(4) through (6) and Table A–VI/4–2.

**3.** As discussed *infra,* the May 2, 2003 ruling was in error.

person designated to provide medical care. The relevant provision in the letter relied upon by plaintiff states:

> If by practice, company policy, or to meet STCW requirements, someone aboard a seagoing ship is designated to take charge of medical care, that individual must meet the standards of competency set forth in STCW Code, Section A–VI/4–2, and be able to produce evidence of having met those standards.

(Plaintiff's Memorandum of Law in Support of Applicability of United States Coast Guard Regulations Relative to the Designation of Charles Mayes, Dated April 27, 2003, No Docket Entry No. Assigned, Ex. 1; henceforth: "Plaintiff's USCG Memorandum").

As stated in open court on May 2, 2003, the issue of whether Keystone had a policy or practice and designated Mr. Mayes as a person in charge of medical care was a fact issue for the jury.[4] Although the theory of liability was based on the policy letter, it inevitably required the jury to find a violation of 46 C.F.R. § 12.13–1 (1999) albeit only through a practice or company policy. Question two in the special verdict form asked the jury to determine by a preponderance of the evidence if Keystone breached a Coast Guard regulation by a practice or company policy.[5] They answered affirmatively.

Question one asked the jury to determine if Keystone was negligent and whether that negligence was a cause of an injury to plaintiff. Again, the jury answered the question affirmatively.

The general instructions distinguished between the two theories of liability, negligence and negligence per se [6] based on the violation of 46 C.F.R. § 12.13–1 (1999). (Docket Entry # 49, p. 25). For practical purposes, the jury's finding in question two is relevant primarily to the issue of contributory negligence under section 53. See Pratico v. Portland Terminal Co., 783 F.2d 255, 269 (1st Cir.1985) (Campbell, C.J., dissenting) (addressing section 53 and noting that, "[f]or practical purposes," the negligence per se finding "has little effect" because the "plaintiff was able to convince the jury of [the] defendant's negligence without the benefit of evidence of the OSHA regulation"). On May 6, 2003, the jury assessed damages amounting to $1,848,750 but found plaintiff 45% at fault.

Because of the contentious nature and difficulty of the issue, this court asked for additional briefs from the parties regarding the reduction of the $1,848,750 damages based on the jury's finding plaintiff

---

**4.** This court cited the parties to *Pan American Grain Manufacturing Co., Inc. v. Puerto Rico Ports Authority*, 295 F.3d 108, 115–116 (1st Cir.2002); *Havinga v. Crowley Towing and Transportation Co.*, 24 F.3d 1480, 1483 (1st Cir.1994).

**5.** The instructions quoted and explained the relevant regulation, 46 C.F.R. § 12.13–1 (1999). In order to find a breach of the regulation, the instructions required the jury to determine both that Keystone designated Mayes as the person to take charge of medical care and that it did so by a company practice or policy. The relevant language states:

> It is for you to determine if there is sufficient evidence to show that Mr. Mayes was designated "to take charge of medical care" by a practice or company policy as opposed to simply being designated "to provide first aid" by a practice or company policy or was not designated at all.

(Docket Entry # 49, p. 24).

**6.** Negligence per se is somewhat of a misnomer. Negligence per se is based on the violation of a federal safety statute which in itself creates "an actionable wrong, in no way dependent upon negligence." *O'Donnell v. Elgin*, 338 U.S. 384, 390, 70 S.Ct. 200, 94 L.Ed. 187 (1949) (discussing confusion inherent in use of term "negligence" to describe statutory violation).

45% at fault. The parties submitted the additional briefs as of June 5, 2003. Plaintiff's filing (Docket Entry # 76, p. 9) asks this court to award the full amount of the jury verdict barring any assessment of plaintiff's negligence. This court therefore construes the filing as a motion to enter a judgment for the full amount of the jury's verdict without a reduction due to plaintiff's negligence. *See, e.g., Primus v. Galgano,* 187 F.Supp.2d 1, 2 (D.Mass.2002) (motion filed by the defendant after jury verdict and prior to final judgment for entry of judgment to reduce medical malpractice verdict to statutory cap), *aff'd,* 329 F.3d 236 (1st Cir.2003); *Hawn v. Pope & Talbot,* 99 F.Supp. 226, 228 (E.D.Pa.1951) (Longshoremen's and Harbor Workers' Compensation claim wherein the plaintiff filed motion for entry of judgment after jury verdict and prior to judgment for full amount without deduction for contributory negligence). Defendant's filing insists that the jury's verdict of 45% contributory negligence must stand. (Docket Entry # 80, p. 6). The issue of reducing the verdict by the proportion of plaintiff's contributory negligence under section 53 due to the violation of 46 C.F.R. § 12.13–1 (1999) ("regulation 12.13–1") or the policy letter itself is therefore ripe for review.

## DISCUSSION

Plaintiff presently moves for the entry of the full amount awarded by the jury arguing, *inter alia,* that defendant breached regulation 12.13–1, in effect since July 31, 1998, and that section 53 therefore bars the assessment of plaintiff's 45% contributory negligence. (Docket Entry # 76). Plaintiff's motion to enter a judgment for the full amount of the jury verdict without an assessment of plaintiff's negligence results in revisiting the import of the policy letter [7] and the grandfathering issue under regulation 12.13–1 thereby implicating the May 2, 2003 ruling.

This court has the inherent power to reconsider prior rulings. *Greene v. Union Mutual Life Insurance Company of America,* 764 F.2d 19, 22 (1st Cir.1985); *Ramos v. Roman,* 83 F.Supp.2d 233, 236–237 (D.P.R.2000); *see In Re Villa Marina Yacht Harbor, Inc.,* 984 F.2d 546, 548 (1st Cir.1993) (court's inherent power is rooted in the equitable power to "process litigation to a just and equitable conclusion"); *see also Langevine v. District of Columbia,* 106 F.3d 1018, 1023 (D.C.Cir.1997) ("[i]nterlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment"); *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994) (" 'Until entry of judgment, interlocutory orders remain subject to change at any time;' " quoting treatise with brackets omitted); *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir. 1991) ("courts have inherent power to reconsider interlocutory orders and re-open any part of a case before entry of a final judgment"). The jury's special verdict under Rule 49(a), Fed.R.Civ.P., was interlocutory inasmuch as this court intended to reserve the issue of whether to reduce the verdict by plaintiff's contributory negligence and asked for further briefing on the issue. *See Commercial Union Insurance v. Seven Provinces Insurance Co.,* 217 F.3d 33, 37 (1st Cir.2000) (" 'final decision' ... is [ ] " 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment' " "), *cert. den.,* 531 U.S. 1146, 121

---

**7.** Defendant first provided this court with the policy letter as an exhibit to a memorandum transmitted by facsimile late in the day at 4:10 p.m. on Wednesday, April 23, 2003. The memorandum was never docketed. The hearing took place on Thursday and Friday April 24 and 25, 2003. Trial commenced the following Monday April 28, 2003.

S.Ct. 1084, 148 L.Ed.2d 959 (2001);[8] *Zayas–Green v. Casaine*, 906 F.2d 18, 21 (1st Cir.1990) ("by definition, interlocutory orders are not final decisions"); *see, e.g., Harris v. Goldblatt Brothers, Inc.*, 659 F.2d 784, 786 (7th Cir.1981) (judgment entered by clerk after jury verdict not final judgment inasmuch as court never contemplated the verdict to constitute final judgment but, instead, decided to hear equitable relief and statutory attorney's fees issues after jury trial).

After a more careful and considered examination of the Code of Federal Regulations, the history of regulation 12.13–1 and the STCW Convention outside the rapid pace of trial, this court concludes that the documentation and training required by this regulation for persons designated to take charge of medical care was not grandfathered. The prior ruling in open court relative to grandfathering was a manifest error of law and it would be unjust to reduce the verdict where, as here, no such reduction is required under the law.

**I. *Section 53***

The Jones Act, 46 U.S.C. § 688, expressly incorporates the FELA, 45 U.S.C. §§ 51–60, and provides seamen with the same rights as those enjoyed by railroad employees. *Roy Crook and Sons, Inc. v. Allen*, 778 F.2d 1037, 1038 (5th Cir.1985). Section 53 of the FELA therefore applies.

■ The FELA and, by incorporation, the Jones Act are departures from the common law designed to protect those persons who work in inherently dangerous environments. *Duzon v. Stallworth*, — So.2d ——, ——, 2002 WL 31926446 at * 3 (2002), *writ den.*, 842 So.2d 1101 (La.2003). In developing the FELA with a view to adjust the risks inherent in the industry, courts "have plainly rejected many of the refined distinctions necessary in common-law tort doctrine for the purpose of allocating the risks between persons who are more nearly on an equal footing as to financial ability and ability to avoid hazards." *Kernan v. American Dredging Co.*, 355 U.S. 426, 438, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958).

Section 53 of the FELA eliminates the defense of contributory negligence where the employer violates a safety statute. The relevant provision states that:

> [N]o such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

45 U.S.C. § 53. "Over the years, this provision has been liberally enforced." *Pratico v. Portland Terminal Co.*, 783 F.2d 255, 260 n. 2 (1st Cir.1985).[9]

---

**8.** As determined by the First Circuit in *Commercial Union*, the district court's entry of judgment was not a final decision because it reserved jurisdiction to calculate prejudgment interest "and ordered the parties to submit further briefs." *Commercial Union Insurance v. Seven Provinces Insurance Co.*, 217 F.3d at 37.

**9.** The First Circuit in *Elliott v. S.D.Warren Co.*, 134 F.3d 1, 4–5 (1st Cir.1998), limited the negligence per se holding in *Pratico*. The *Pratico* decision nevertheless remains good

law as to its discussion and holding vis-a-vis contributory negligence under section 53.

In any event, the jury's finding in question two establishes a violation of the regulation and causation thereby entitling plaintiff to recover under a negligence per se theory. *See Kernan v. American Dredging Co.*, 355 U.S. 426, 433, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (recognizing in case involving violation of regulation that Supreme Court refuses to limit liability for breach of statutory duty only to cases where "injury is one which the statute was designed to prevent"); *Moody v. Boston*

Safety statutes within the meaning of section 53 are not limited to those particular statutes contemplated by Congress at the time of the FELA's enactment. *Pratico v. Portland Terminal Co.,* 783 F.2d at 267 (further noting absence of legislative history that Congress intended to limit "the safety statutes which would trigger the elimination of contributory negligence under § 53"). Rather, they include mandatory and specific Coast Guard regulations such as regulation 12.13–1. *See Fuszek v. Royal King Fisheries, Inc.,* 98 F.3d 514, 517 (9th Cir.1996) ("regulatory violation could amount to negligence per se under the Jones Act"); [10] *see, e.g., Kernan v. American Dredging Co.,* 355 U.S. at 431, 78 S.Ct. 394 (navigation rule promulgated by Coast Guard provided basis for imposi-

tion of liability under section 51 in the absence of showing of any negligence); *Pratico v. Portland Terminal Co.,* 783 F.2d at 267–268 (safety regulation promulgated under Occupational Health and Safety Act eliminated application of contributory negligence under section 53).

The regulation at issue is mandatory in nature. Enacted after proper notice and comment, it is a legislative or substantive rule.[11] It dictates that after July 31, 1998, each person designated to provide medical care "shall hold documentary evidence attesting" to the proper training meeting the standards of competence set forth in section A–VI/4 of the STCW Code.[12] *See* 46 C.F.R. § 12.13–3 (1999).

*and Maine Corp.,* 921 F.2d 1, 4 (1st Cir.1990) (citing *Kernan* in FELA case and allowing recovery even though injury was not the type that statute was designed to protect, albeit for statutory as opposed to regulatory violation); *see also Coray v. Southern Pacific Co.,* 335 U.S. 520, 523–524, 69 S.Ct. 275, 93 L.Ed. 208 (1949) (if breach of Safety Appliance Act "contributes in part to an employee's death, the railroad must pay damages"). Even under the more rigorous findings required by the Fifth Circuit to establish negligence per se in the context of the violation of a regulation, *see Smith v. Trans–World Drilling Co.,* 772 F.2d 157, 160 (5th Cir.1985), plaintiff is entitled to recover. Plaintiff was a seaman in sea service and therefore a member of the class of beneficiaries that the regulation was designed to protect. As discussed more fully *infra,* the STCW Convention expresses a desire to promote the safety of life at sea. The enabling statute for the regulation, 46 U.S.C. § 2103, allows the Coast Guard to enforce the certification requirements in the interest of seamen's welfare. *See also* 14 U.S.C. § 2. Plaintiff suffered an acute abdominal condition and a person designated to take charge of medical care with proper training would have recognized the severity of the condition and the need for more immediate treatment.

**10.** Although related, the issue before this court is not the application of the negligence per se doctrine but the elimination of contrib-

utory negligence as a defense to the negligence action where, as here, the jury found liability on the basis of negligence.

**11.** A substantive or " 'legislative-type rule' " is "one 'affecting individual rights and obligations.' " *Chrysler Corp. v. Brown,* 441 U.S. 281, 301–302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *see also Williams v. Hanover Housing Authority,* 871 F.Supp. 527, 532 n. 4 (D.Mass. 1994) (substantive rule "must affect or modify law, policy or individual rights and obligations"). In order to characterize a rule as legislative, the agency must intend to exercise its delegated lawmaking power. *Levesque v. Block,* 723 F.2d 175, 182 (1st Cir.1983); *American Postal Workers Union v. U.S. Postal Service,* 707 F.2d 548, 558–559 (D.C.Cir. 1983). In general, " 'If a rule creates rights, assigns duties, or imposes obligations, *the basic tenor of which is not already outlined in the law itself,* then it is substantive.' " *Warder v. Shalala,* 149 F.3d 73, 80 (1st Cir.1998) (quoting *La Casa Del Convaleciente v. Sullivan,* 965 F.2d 1175, 1178 (1st Cir.1992)).

**12.** The relevant versions of 46 C.F.R. § 12.31–1 (1999) and 46 C.F.R. § 12.31–3 (1999) read as follows:

§ 12.13–1  Documentary evidence required. After July 31, 1998, each person designated to provide medical first aid on board ship, or to take charge of medical care on

■ The cited authority for the promulgation of regulation 12.13–1 as well as the purpose of the STCW Convention militate towards construing the regulation as a safety statute within the meaning of section 53 for the following reasons. The preamble to the STCW Convention, from which the regulation arose,[13] begins by expressing the treaty's goal of "desiring to promote safety of life and property at sea and the protection of the marine environment by establishing in common agreement international standards of training, certification and watchkeeping for seafarers." S. Exec. Doc. EE 96–1. Logically, uniform standards of competence established by STCW promote the safety of life at sea.

■ Second, the cited authority for part 12 of volume 46 of the Code of Federal Regulations entitled "Certification of Seamen" includes, *inter alia,* 46 U.S.C. § 2103 ("section 2103"). Section 2103 endows the Secretary of the department in which the Coast Guard is operating with the authority to enforce subtitle II "[i]n the interests of marine safety and seamen's welfare" and to prescribe regulations to carry out the provisions of subtitle II. 46 U.S.C. § 2103. Part E of subtitle II governs licenses and certificates of registry for merchant seamen. Section 3703 of Title 46 of the United States Code reinforces the principle that a Coast Guard regulation that sets forth the qualifications and training of officers and crew, such as regulation 12.13–1, is a safety statute. Like section 2103, section 3703 authorizes "[t]he Secretary" to prescribe regulations for "personnel qualification, and manning of vessels ... that may be necessary for the increased protection against hazards to life and property [and] for navigation and vessel safety." 46 U.S.C. § 3703; *see also* 48 F.R. 11365 (March 17, 1983) ("Coast Guard is the dominant federal agency with the statutory authority to prescribe and enforce standards or regulations affecting the occupational safety and health of seamen"). Finally, as pointed out by plaintiff, the Coast Guard has the authority to "promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas." 14 U.S.C. § 2. Regulation 12.13–1 therefore falls within the reach of section 53.[14]

board ship, shall hold documentary evidence attesting that the person has attended a course of training in medical first aid or medical care, as appropriate.

§ 12.13–3 Basis of documentary evidence.
The Officer in Charge, Marine Inspection will issue such documentary evidence to the person, or endorse his or her license or document, on being satisfied that the training required under section 12.13–1 of this section established that he or she meets the standards of competence set out in STCW Regulation VI/4 and Section A–VI/4 of the STCW Code.

13. Regulation 12.13–1 is a part of regulations issued by the Coast Guard in 1997 to implement the 1995 amendments to the Convention. 62 FR 34506, 34506 (June 26, 1997); *see also United States v. Locke,* 529 U.S. 89, 113, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) ("STCW Convention addresses 'training' and

'qualification' requirements of the crew, Art. VI, and ... the United States has enacted crew training requirements," citing 46 C.F.R. pts. 10 & 12 (1999)). Part 12 of volume 46 of the Code of Regulations, like part 10, incorporates the STCW Convention and the STCW Code by reference. 46 C.F.R. § 12.01–3 (1999). The STCW Convention therefore provides a useful reference to interpret the intent of the drafters of regulation 12.13–1.

14. Neither party questions the validity or reasonableness of the agency's exercise of its delegated powers. Congress has not spoken directly on the issue of the qualifications for persons designated to take charge of medical care. Issuance of the regulation was a permissible exercise of the enabling statute and a permissible construction. *See generally United States v. Mead Corp.,* 533 U.S. 218, 226–227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Chevron U.S.A., Inc. v. Natural Resources De-*

■ In contrast, unlike regulation 12.13–1, the rule in the policy letter relied upon by plaintiff does not, standing alone, constitute a "statute enacted for the safety of employees" under section 53. Assuming for purposes of argument only that a policy letter could conceivably fall within the reach of section 53, it would, at a minimum, need the "force and effect of law" as a legislative or substantive rule. *See generally Chrysler Corp. v. Brown*, 441 U.S. 281, 301–302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (discussing circumstances under which regulations have the force and effect of law); *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir.1998) (legislative or substantive rules "have the force and effect of law"). On its face, the language "any statute enacted" does not encompass an interpretive policy letter or rule issued by a commanding officer of the applicable agency that is exempt from the notice of proposed rule making and opportunity for public comment, *see* 5 U.S.C. § 553(b), and is non-binding in nature.[15] *See generally BP Exploration & Oil, Inc. v. U.S.Dept. Of Transportation*, 44 F.Supp.2d 34, 37 (D.D.C.1999) (discussing interpretive rules

as non-binding and not subject to notice and comment procedures).

■ The language of the policy letter refutes classifying the rule therein as substantive. The agency itself did not intend the rule to be legislative. The letter begins with the statement that it "provides *guidance* concerning training requirements for certification of mariner competence in the field of medical care." (Plaintiff's USCG Memorandum, Ex. 1; emphasis added); *see United States v. Alameda Gateway, Ltd.*, 213 F.3d 1161, 1168 (9th Cir.2000) (noting that "starting point" is the regulation's text which, in light of its stated purpose to "provide[s] *guidance* on procedures and responsibilities," was interpretive), *cert. dism.*, 531 U.S. 1121, 121 S.Ct. 901, 148 L.Ed.2d 786 (2001). In addition, the rule in the policy letter was never formally published in the Code of Federal Regulations or the Federal Register. *See United States v. Alameda Gateway, Ltd.*, 213 F.3d at 1168 (failure to publish regulation in Code of Federal Regulations or Federal Register provided "further evidence that the regu-

*fense Council, Inc.*, 467 U.S. 837, 842–845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The agency's regulation that as of July 31, 1998, persons designated to take charge of medical care aboard ship must comply with the applicable STCW Code's competency requirements receives considerable deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 844, 104 S.Ct. 2778; *Quinn v. City of Boston*, 325 F.3d 18, 33 (1st Cir.2003); *Wilcox v. Ives*, 864 F.2d 915, 925 (1st Cir.1988) (deference appropriate where agency's interpretation is consistent with statute).

Separate and apart from the deference afforded the regulation, the agency's interpretation of its own regulation in the policy letter receives "considerable legal leeway," *Barnhart v. Walton*, 535 U.S. 212, 122 S.Ct. 1265, 1269, 152 L.Ed.2d 330 (2002) ("Courts grant an agency's interpretation of its own regulations considerable legal leeway"); *Esden v. Bank of Boston*, 229 F.3d 154, 168–169 (2d

Cir.2000), *cert. dism.*, 531 U.S. 1061, 121 S.Ct. 674, 148 L.Ed.2d 652 (2001), particularly where, as here, it is consistent with the agency's prior views. The policy letter, although lacking the force and effect of law as an interpretive guide, nevertheless provides a useful tool for guidance in assessing the meaning of regulation 12.13–1 and, in particular, the grandfathering of seamen already in service as of July 31, 1998. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Clackamas Gastroenterology Associates v. Wells*, —— U.S. ——, 123 S.Ct. 1673, 1680 n. 9, 155 L.Ed.2d 615 (2003).

**15.** The issue before this court is not whether the regulation is a non-statutory final rule subject to review under the APA. Rather, the issue is whether Congress intended the policy letter, an interpretive rule, to constitute a safety statute enacted within the meaning of section 53.

lation was not intended to be binding"); *Pearce v. United States,* 261 F.3d 643, 649 (6th Cir.2001) (regulation never published in Code of Federal Regulations or Federal Register was not substantive and lacked force of law); *see also* 5 U.S.C. § 552(a)(1) (absent actual notice, person may not "be adversely affected by[ ] a matter required to be published in the Federal Register and not so published").

Moreover, as noted in 46 C.F.R. § 12.01–3, "To enforce any edition other than [the material incorporated by reference such as the Convention and the Code], the Coast Guard must publish notice of change in the FEDERAL REGISTER." Finally, regulation 12.13–1 does not, for reasons stated *infra,* grandfather seamen already in service as of July 31, 1998. Consequently, the language relied upon by plaintiff in the policy letter does not impose an obligation not already outlined in the legislative regulation. Properly characterized as an interpretive rule or general statement of policy, the statement in the policy letter relied upon by plaintiff lacks the force and effect of law. Standing alone, it is neither "enacted" or a "statute" within the meaning of section 53.[16]

In sum, regulation 12.13–1 is a safety statute within the meaning of section 53. The language in the policy letter relied upon by plaintiff, however, does not qualify as a "statute enacted" for employees' safety within the meaning of section 53. As an interpretive rule, it is not binding and lacks the force and effect of law. Regulation 12.13–1 therefore provides the basis, if any, for applying the statutory bar against reducing the jury verdict in section 53.

II. *Regulation 12.13–1 and Grandfathering*

██ At the pretrial evidentiary hearing and during trial, Keystone argued that regulation 12.13–1 grandfathered Mayes' documentation. Keystone submits that there were no training requirements for a person designated to take charge of medical care for a person, such as Mayes, who began his seagoing service before August 1, 1998. Plaintiff disagrees and submits that Mayes was in breach of regulation 12.13–1 because he admittedly lacked the necessary certification. This court agrees with plaintiff. While the STCW regulations in parts 10 and 12 of volume 46 of the Code of Federal Regulations grandfathered certain individuals under certain circumstances, the regulations did not grandfather a person designated to take charge of medical care.

First and foremost, the language of the regulation is relatively clear on its face. It imposes an immediate obligation "[a]fter July 31, 1998," requiring that vessels subject to STCW have the necessary documentation for persons designated to take charge of medical care. The language reads as follows:

> After July 31, 1998, each person designated to provide medical first aid on board ship, or to take charge of medical care on board ship, shall hold documentary evidence attesting that the person has attended a course of training in medical first aid or medical care, as appropriate.

46 C.F.R. § 12.13–1 (1999). Regulation 12.13–3, which immediately follows regulation 12.13.–1, establishes that the person must meet the standards of competence set forth in STCW regulation VI/4 and section A–VI/4 of the STCW Code in order to obtain the required documentation.

An examination of the legislative history of the rule as set forth by the agency's

---

**16.** This finding does not preclude using the policy letter as an interpretive guide to construe the meaning of regulation 12.13–1. *See* fn. 14, 2nd ¶.

comments in response to public questions preceding the 1997 issuance of the rule as well as the structure of the STCW regulations as a whole confirms that the drafters did not intend to grandfather persons designated to take charge of medical care even if they were in seagoing service as of July 31, 1998.[17] *See, e.g., Bertschland Family Practice Clinic, P.C. v. Thompson,* 2002 WL 1364155 at *8–9 (S.D.Ind. June 4, 2002) (examining legislative history of regulation which supported regulation's plain language). The relevant inquiry is to discern the intent of the drafters of the regulation, *see, e.g., Pratico v. Portland Terminal Co.,* 783 F.2d at 260 (examining whether "framers of this regulation meant to include this kind of device under the safety regulations governing the use of jacks"), and, in particular, whether they intended to have mariners already in seagoing service as of July 31, 1998, comply with the certification before such mariners applied for a renewal of their term licenses.

▮ Legislative history, while not conclusive, gives insight into the intent of the drafters. *Weil v. Long Island Savings Bank,* 195 F.Supp.2d 383, 388–389 (E.D.N.Y.2001). Such history includes the agency's responses to public comments published in the Federal Register. *See, e.g., Bertschland Family Practice Clinic, P.C. v. Thompson,* 2002 WL 1364155 at *8–9 (S.D.Ind. June 4, 2002) (examining agency's response to public comments that preceded final rule as indicative of legislative history of agency regulation); *Weil v. Long Island Savings Bank,* 195 F.Supp.2d at 389 (examining the section by section discussion regarding proposed amendments to the regulation set forth in Federal Register to ascertain legislative history of agency regulation). The legislative history of regulation 12.13–1 with respect to grandfathering is as follows.

On March 26, 1996, the Department of Transportation and the Coast Guard gave public notice of the proposed rule making that led to regulation 12.13–1. 61 FR 13284 (March 26, 1996). Therein, the Coast Guard proposed changing the current domestic rules governing licensing and documentation to comply and conform to the 1995 amendments to STCW which came into force on February 1, 1997. *See* 61 FR 13284, 13284 (March 26, 1996) ("the Coast Guard is taking the steps necessary to implement the revised requirements to ensure that U.S. documents and licenses are issued in compliance with the 1995 Amendments"); 62 FR 34506, 34506 (June 26, 1997) ("1995 amendments to STCW came into force on February 1, 1997").

Article VII of the STCW convention endorses the grandfathering of certificates for seafarers in sea service before entry into force of the treaty.[18] In the March 1996 notice of proposed rulemaking, the Coast Guard also recognized the existence

---

**17.** While resort to legislative history or agency interpretations of the legislative regulation may not be necessary in light of the straight forward language, for purposes of providing context and a more complete record this court reviews the history as well as the structure and content of other regulations in parts 10 and 12.

**18.** Article VII(2) provides that:
   After entry into force of the Convention for a Party, its Administration may continue to issue certificates of competency in accordance with its previous practices for a period not exceeding five years. Such certificates shall be recognized as valid for the purpose of the Convention. During this transitional period such certificates shall be issued only to seafarers who had commenced their sea service before entry into force of the Convention for that Party .... The Administration shall ensure that all other candidates for certifications shall be examined and certified in accordance with the Convention.
   S. Exec. Doc. EE 96–1.

of a STCW regulation that allowed "some requirements to come into force more gradually." 61 FR 13284, 13289 (March 26, 1996).

Significantly, the March 26, 1996 notice of proposed rulemaking intimates that a number of provisions would come into force immediately whereas others would come into force more gradually. The relevant statements by the Coast Guard are as follows:

10. Effective dates. As noted earlier, the 1995 Amendments to STCW come into force on February 1, 1997. However, STCW Regulation I/15, on transitional provisions, allows some requirements to come into force more gradually. The Coast Guard will be working at IMO to establish an international agreement on precisely which requirements must come into force as of February 1, 1997. Any agreement reached at IMO will be taken into figure in drafting the final rule. STCW Regulation I/15 provides that a Party may continue, until February 1, 2002, to issue certificates (licenses) in accordance with the domestic rules it has in place before the 1995 Amendments come into force (February 1, 1997) only in respect to seafarers who begin their sea service or their approved maritime training before August 1, 1998. Candidates who begin their service or their training after then will be subject to the full application of the revised STCW requirements.

Where options presented by this proposed rule would be to the advantage of the maritime industry in the United States, there may be no need to defer or delay implementation. Comments on the most suitable effective dates for new requirements . . . should be submitted to the docket.

61 FR 13284, 13289 (March 26, 1996).

In addition to grandfathering some but not necessarily all seamen who began their training before August 1, 1998, the Coast Guard envisioned implementing a section in Part 10 requiring that renewals of licenses after July 31, 1998, must conform to the STCW requirements without further grandfathering. With respect to the subject of license renewals, the March 1996 notice of proposed rulemaking stated:

10. Requirements for Renewal of Licenses

The Coast Guard is proposing to add a new subsection under § 10.209 to indicate that after July 31, 1998, applicants for renewals will have to meet new requirements for holding the original licenses at the grades concerned.

Candidates for renewal of licenses as masters or mates for service on vessels in ocean or near-coastal service, or as operators of uninspected passenger vessels operating beyond the boundary line, will have to have the appropriate training or instruction in firefighting, personal survival techniques, and personal safety and social responsibility . . . .

The proposed deadline of July 31, 1998, derives from the transitional provisions of the 1995 Amendments to STCW, which allow for a phase-in of new requirements up to August 1, 1998. STCW Regulation I/15 permits a Party to renew certificates (licenses) until February 1, 2002, in accordance with rules that will be in effect before February 1, 1997. However, to meet the target for full implementation in 2002, it is necessary to process renewals in accordance with new requirements beginning in 1998.

61 FR 13284, 13291 (March 26, 1996).

On June 26, 1997, the Coast Guard issued the interim rule that led to regulation 12.13–1 (1999) with a request for com-

ments.[19] CGD 95–062, 62 FR 34506 (June 26, 1997). The effective date was July 28, 1997. Significantly, regulation 12.13–1 as it first appeared in 1997 as well as in 1998 and 1999 identifies CGD 95–062, 62 FR 34537, as its source. Preceding the interim rule published at page 34537, the Coast Guard responded to various comments from the public in CGD 95–062. CGD 65–062 applies to parts 10, 12 and 15 of volume 46 of the Code of Federal Regulations. 62 FR 34506, 34528 (June 26, 1997).

As set forth in CGD 95–062, the Coast Guard took the position that there was a five year transitional period for current license holders who had commenced sea service before July 31, 1998. Stated conversely, seamen who commenced training on or after August 1, 1998, would have to comply with the new requirements in the 1995 amendments to STCW. When the former category of seamen subsequently applied for renewals of their licenses for service taking place after February 1, 2002, however, they would have to comply with the new STCW training requirements. The relevant portions of CGD 95–062 are as follows:

> Several comments suggested that the new requirements not be imposed for at least 2 to 5 years to allow for compliance. There is a 5–year transitional period provided under the 1995 Amendments that is intended to avoid disruption in the industry by allowing current license holders to have their licenses renewed under the prior rules until 2002. *The Coast Guard has redrafted*

*the rule as proposed to allow for the phasing in of new requirements* in accordance with the guidance developed by the Subcommittee of IMO on Standards of Training and Watchkeeping (STW) at its 28th session in September 1996. This guidance was issued in the form of an STCW circular (STWC–7/Circ.1; September 24, 1996),[20] which is available on request from the Commandant (G–MSO) at the address given under ADDRESSES. Where appropriate, the circular is quoted in the following discussion.

62 FR 34506, 34507 (June 26, 1997) (emphasis added).

Elsewhere, the Coast Guard reiterated that the new training and certification requirements applied only to those seamen who commenced sea service after July 31, 1998:

> One comment stated that the new requirements for approved training and practical demonstration of competency should apply only to seafarers who commence training or sea service on or after August 1, 1998. The Coast Guard agrees that those new requirements (other than basic safety-training and training for Ro–Ro passenger ships) should apply only to those seafarers and only on or after that date. But it notes that seafarers renewing their licenses for any service that will take place on or after February 1, 2002, will have to meet requirements for approved training and demonstration of skills to qualify for an

---

**19.** The Coast Guard first published the regulation in the Code of Federal Regulations in 1997. The language of this rule is the same as the interim rule. 46 C.F.R. § 12.13–1 (1997). The language remained unchanged in the 1998, 1999 and 2000 Codes of Federal Regulations.

**20.** Although on May 2, 2003, this court gave plaintiff the opportunity to provide this court with a copy of the referenced STCW circular, plaintiff did not provide this court with a copy of the circular. In fact, neither defendant nor plaintiff provided this court with a copy of the circular even in the post trial briefing. The circular would have provided further guidance relative to grandfathering.

STCW endorsement which will be valid for such service.

After publication of the NPRM, the IMO Subcommittee on STW developed guidance on the revalidation of certificates after February 1, 1997, for service on seagoing ships after February 1, 2002. Essentially, the STCW guidance (as contained in STCW.–7/circ.1; September 24, 1996) provides that certificates (i.e., licenses) should not be revalidated (or endorsed) for service after February 1, 2002, and so makes the certificate holder meet the standards of competence required by the 1995 Amendments.

62 FR 34506, 34510 (June 26, 1997).

As noted above, in CGD 95–62 the Coast Guard stated it would redraft the rule to allow for the phasing in of the new requirements. The referenced redrafting occurred in part 10, as opposed to part 12, and governed applicants for licenses for master, chief mate, second mate, third mate, mate, operator, chief engineer and various assistant levels to the chief engineer. Noteworthy by its absence is an applicant for documentary evidence or endorsement as a person designated to take charge of medical care. *See Lopez–Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir.1999) (interpreting statute under canon of construction that, " 'It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another' "). The referenced, redrafted rule as it appears in CGD 95–062 is as follows:

(c) Each candidate for any of the following licenses, who commences Coast Guard approved or accepted training or approved seagoing service on or after August 1, 1998, or who applies for the license on or after February 1, 2002, shall meet the requirements of the appropriate regulations and standards of competence in STCW and in part A of the STCW Code, as indicated in table 903–1:

(1) Master, oceans and near coastal, any gross tons.

(2) Chief mate, oceans and near coastal, any gross tons.

(3) Master, oceans and near coastal, 500 to 1600 gross tons.

(4) Second mate, oceans and near coastal, any gross tons.

(5) Third mate, oceans and near coastal, any gross tons.

(6) Mate, oceans and near coastal, 500 to 1600 gross tons.

(7) Operator, uninspected towing vessel of over 200 gross tons, oceans (domestic trade) and near coastal.

(8) Master (OSV).

(9) Chief mate (OSV).

(10) Mate (OSV).

(11) Chief engineer, unlimited.

(12) 1st Assistant engineer, unlimited.

(13) 2nd Assistant engineer, unlimited.

(14) 3rd Assistant engineer, unlimited.

(15) Chief engineer, limited—oceans.

(16) Chief engineer, limited—near coastal.

(17) Chief engineer (OSV).

(18) Engineer (OSV).

62 FR 34506, 34533 (June 26, 1997). The Coast Guard therefore grandfathered (until February 1, 2002) all the aforementioned seaman applying for the above licenses who were in seagoing service as of July 31, 1998. Except for minor variations, the above rule, which appears in 46 C.F.R. § 10.903(c) (1997), remained unchanged in the 1998, 1999 and 2000 Codes

of Federal Regulations. As shown by the breadth of the list, the Coast Guard grandfathered the great majority of seamen who were in sea service as of July 31, 1998.

Section 10.903(c) appears in part 10 as opposed to part 12. It is silent with respect to grandfathering a person designated to take charge of medical care. *See Lopez–Soto v. Hawayek*, 175 F.3d at 173. The plain language of regulation 12.13–1 is that "[a]fter July 31, 1998," the designated person to take charge of medical care shall hold the required documentation. Grandfathering seamen who were in sea service as of July 31, 1998, would render the regulation's language "[a]fter July 31, 1998," meaningless. *See Lopez–Soto v. Hawayek*, 175 F.3d at 173 (" 'no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous' "); *accord United States v. Ahlers*, 305 F.3d 54, 58 (1st Cir.2002) (same).

The December 1999 policy letter which, unlike the foregoing, post dates the implementation of the original regulation but nevertheless provides useful guidance,[21] supports this construction. It does not set forth a time table for persons designated to take charge of medical care. As does the regulation, the policy letter distinguishes between persons designated to provide medical first aid and persons designated to take charge of medical care. It describes grandfathering for seamen who began sea service before August 1, 1998, with respect to persons designated to provide medical first aid.[22] It does not discuss such grandfathering in the section applicable to persons designated to take charge of medical care. The policy letter is therefore consistent with the plain language and legislative history of not grandfathering persons designated to take charge of medical care.

██ In sum, the plain language of the regulation requires compliance "[a]fter July 31, 1998." 46 C.F.R. § 12.13–1 (1999). The legislative history and other relevant material confirm this interpretation. Regulation 12.13–1 did not grandfather seamen designated to take charge of medical care who were already in sea service as of July 31, 1998. In answering special verdict question two, the jury necessarily found that Keystone designated Mayes as a person to take charge of medical care. They also necessarily found that Keystone violated regulation 12.13–1. Mayes lacked the required training and endorsement but nevertheless served in this capacity. *See* 46 C.F.R. § 15.1103 (1999). Section 53 bars contributory negligence where, as here, the employer violated a safety statute such as regulation 12.13–1 that contributed to the incident. The verdict is therefore not reduced based on the jury's assessment of plaintiff's negligence. In accordance with the joint stipulation, a final judgment will enter for plaintiff in the amount of $1,800,000.[23]

## CONCLUSION

In accordance with the foregoing discussion, plaintiff's post trial memorandum

---

**21.** See footnote 14.

**22.** This court need not decide whether this provision contravenes the express language of the legislative regulation. One possible explanation for providing grandfathering to persons designated to provide medical first aid is that a number of licenses require first aid training. *See* 46 C.F.R. § 10.910, Table 10.910–2 (1999) (medical care examination topic). As previously discussed, applicants for various licenses were grandfathered if they were in sea service before August 1, 1998.

**23.** Plaintiff indicated during the trial that maintenance and cure, although set forth in the complaint, were no longer an issue.

(Docket Entry # 76, p. 9), construed as a motion to award plaintiff the amount of the jury verdict without an assessment of plaintiff's contributory negligence, is **ALLOWED**.