**CARTER v. CHICAGO, R. I. & P. R. CO.**

No. 22964.    Feb. 2, 1937.

Rehearing Denied March 9, 1937.

William Paxton Morrison, A. L. Morrison, and John Morrison, for plaintiff in error.

W. R. Bleakmore, John Barry, W. L. Farmer, and Robert E. Lee, for defendant in error.

CORN, J. This is an appeal from an order sustaining a demurrer to the plaintiff's evidence in an action in the district court of Kingfisher county, wherein D. P. Carter sued the Chicago, Rock Island & Pacific Railway Company for damages for alleged personal injuries sustained by the plaintiff in the performance of his regular duties as a brakeman on a freight train on a run between Waurika and El Reno.

At the trial it was stipulated between the parties that the train on which the plaintiff claimed to have been injured was engaged in interstate commerce at the time, and that the action was governed by section 8631, U. S. Compiled Statutes of 1918, known as the Boiler Inspection Act, and by section 8639A, extending the application of section 8631 to the entire locomotive and tender and all parts and appurtenances thereof.

The plaintiff alleges in his petition that the engine was in bad condition in that one of the eccentric rods was defective and the valve and working parts to which the rod was attached were old and defective, and that by reason thereof the rod broke and caused the air line to break, which in turn caused the brakes to be suddenly applied, bringing

the train to an abrupt and unusual stop, which threw the plaintiff against the window-facing in the caboose, causing the bone in the left side of his face to be crushed; that as a result of these injuries the plaintiff's earning power was totally destroyed, and the plaintiff prayed judgment for damages in the sum of $30,000.

The defendant's answer sets out as a defense to the action that plaintiff executed a release of all claims for damages due to the alleged injuries, and that of assumed risk and contributory negligence.

The reply specifically denies the assumption of risk and contributory negligence, and further states that if the defendant did have in its possession a release signed by the plaintiff, it was obtained by fraud and mutual mistake of fact in that at the time it was signed the company doctor told plaintiff that he was not seriously injured and that his injuries would not be permanent, but that plaintiff later found them to be both serious and permanent.

There is no dispute that the eccentric rod broke and caused the air line to break, which in turn caused the brakes to be applied as alleged, but there is a conflict of evidence as to whether the automatic application of the brakes caused an unusual and abrupt stop as alleged in plaintiff's petition. Two of the train crew were called as witnesses by the plaintiff, and their testimony on this particular point was to the effect that the train stopped in about the same time as an ordinary service stop. But the plaintiff testified that it was an unusually sudden, unexpected, and a bad stop; that there were about 70 cars in the train and that it was moving at about 30 miles an hour; that he was sitting in the cupola in the caboose at the window where it was his duty to be at the time, and without warning, except the noise of the cars ahead as they jammed against each other, he was thrown against the window sash with such force and violence that the impact broke his jaw; that the injury was painful, making him sick and causing him to vomit; that the accident occurred just north of Addington, and after engine repairs were made the train proceeded on to El Reno; that he went to the company's doctor there, and the doctor gave him some little pills to ease his pain and told him that he would be all right in two or three days; that he continued to suffer pain from the injury and went to another doctor, who examined him and found his jaw broken, and bandaged it and put a plaster on his face; that thereafter he was treated by the company's doctor and that the bandage was removed before the broken bone reunited; that in a few days the said doctor told him he could go back to work, and he did go back to work, but had to quit on account of pain from the injury.

Dr. W. B. Catto, the private physican who bandaged the jaw, testified that the removal of the bandage caused the jaw to come out of line and a poor union to result; that any kind of work which jarred the nerves over the fracture would cause pain, and that the injury was permanent.

Notwithstanding the apparent conflict in the testimony as to the abruptness of the stop, the indisputable fact remains that the stop was unexpected and unusual and was made with such abruptness that the plaintiff was thrown against the window sash with sufficient force to break his jaw. The case was tried about three years after the accident occurred, and at the trial the plaintiff not only exhibited the broken jaw to the jury, but permitted each juror to feel with his fingers the malformation of the broken bone.

The trial court, in sustaining the demurrer to the evidence, must have accepted the theory of the defense that the breaking of the defective parts of the engine was not the proximate or a contributing cause of the injury, or that the plaintiff assumed the risk, or was guilty of contributory negligence.

There is no conflict in the evidence as to the defectiveness of the locomotive, nor that the brakes were automatically applied as a result of the broken and defective parts, causing the train to stop by accident and without control of the engineer. The only conflict we find in the evidence is as to the kind of a stop that was made; that is, whether the train fortuitously made an ordinary stop as if made under the control of the engineer, and such a stop as need not jeopardize the safety of any of the employees, or whether the stop so made was unusual and hazardous. These are questions of fact for the jury. Also, whether the defectiveness of the locomotive was the proximate cause of the injury is a question of fact for the jury.

The plaintiff's own testimony developed the fact that he was not totally disabled, but we think that the extent of his disability and loss of earning power, if any, is a question of fact for the jury to determine. Under this view of the case we deem it improper to discuss the merits of the case further than what we have already said.

In the further consideration of the case, and particularly with reference to the application of the doctrine of assumption of risk and of contributory negligence under the federal act referred to, it would be well to consider the following cases:

In Lehigh Valley R. Co. v. Beltz, 10 Fed. (2d) 74, the conductor of the train was riding on one of the engines when the main pin broke, causing the driving parallel rods to fly about, disabling the engine and punching a hole in the boiler, which caused a violent emission of steam, hot water, and coals of fire into the cab. Those on the engine jumped off in an effort to save their lives, and the conductor received fatal bodily injuries. The trial court, on the theory that the Boiler Inspection Act made the railway company liable as an insurer against all defects of its rolling stock, and that the breaking of the pin was sufficient to show a violation of the act, instructed the jury that the only question for their consideration was the amount of damages. The defendant contended that it was not liable to employees for failure to keep the engine free from defects where the defects were not due to defendant's negligence.

The Circuit Court of Appeals held there was no error in the case. In affirming the judgment for the plaintiff, the court said:

"An 'absolute duty' is one which is not subject to any limitation or condition. It is positive and not dependent. It is unqualified by any conditions or considerations whatsoever. If the Boiler Inspection Act imposed on the defendant an absolute duty to have the boiler and appurtenances thereof safe to operate, and substituted that rule for the common-law rule, which holds the employer to ordinary care to provide his employees a reasonably safe place in which, and reasonably safe appliances and machinery with which to work, it in effect makes the employer an insurer of the safety of the place in which the employee works and of the appliances with which he works."

In the case of Chesapeake & O. Ry. Co. v. Smith, 42 Fed. (2d) 111, the plaintiff was a brakeman on a train engaged in interstate commerce. He was riding in the caboose at the time he received the injuries. Through error of the switchman the train had gone down the wrong switch about eight car lengths when for some unknown reason the air brakes were very suddenly applied, causing the cars to be thrown forcibly together and throwing the plaintiff so hard against the door that his head projected through the panel. The evidence showed that the train line was broken at the 20th car ahead of the caboose, and one inference that could have been drawn from the evidence was that the break in the train line preceded the setting of the brakes and caused the sudden stop.

The Circuit Court of Appeals affirmed the judgment for the plaintiff on appeal. In regard to the sudden stop being caused by the break in the air line, the court said:

"If the breaking of the air line preceded the sudden setting of the brakes and caused it, then it was clearly proper for the jury, in the absence of other evidence, to infer from this alone that the injury resulted from the company's failure to comply with the absolute duty imposed upon it by the Safety Appliance Acts."

In the case of Erie R. Co. v. Lindquist, 27 Fed. (2d) 98, the Circuit Court of Appeals held:

"The duty which the several safety appliance acts impose on common carriers, differently described as carriers engaged and carriers moving traffic in interstate commerce, is to supply and equip their instrumentalities of commerce with appliances for the safety of their employees, naming them or empowering the Interstate Commerce Commission to specify them. The acts make the duty absolute, and whenever a failure to perform that duty is the proximate cause or a contributing cause of an injury, the acts not only make the carrier liable but the Federal Employers' Liability Act withdraws from it the defenses of the employee's assumption of risk and contributory negligence. Louisville & Nashville R. Co. v. Layton, 243 U. S. 617, 621, 37 S. Ct. 456, 61 L. Ed. 931; Great Northern R. R. Co. v. Donaldson, 246 U. S. 121, 38 S. Ct. 230, 62 L. Ed. 616, Ann. Cas. 1918C, 581; Lang v. New York Central R. Co., 255 U. S. 455, 459, 41 S. Ct. 381, 65 L. Ed. 729; Davis v. Wolfe, 263 U. S. 239, 243, 44 S. Ct. 64, 68 L. Ed. 284; B. & O. R. R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Lehigh Valley R. Co. v. Beltz (C. C. A.) 10 F. (2d) 77; P. & R. Ry. Co. v. Auchenback (C. C. A.) 16 F. (2d) 550, 551, 552; Id. (C. C. A.) 8 F. (2d) 350. But in all cases under these statutes that have come to our attention, performance is complete and liability thereunder ends when the carrier has observed their requirements by supplying and maintaining in operative condition the safety appliances required. We have not found any court, construing such statutes, that has held they extend liability to a carrier when its servants negligently operate safety devices properly supplied and properly maintained."

The judgment of the trial court sustaining the demurrer to plaintiff's evidence and dismissing the cause and overruling the motion for a new trial is reversed and the cause is remanded for a new trial.

OSBORN, C. J., BAYLESS, V. C. J., and RILEY and HURST, JJ., concur. WELCH and PHELPS, JJ., dissent. BUSBY and GIBSON, JJ., absent.