918 So.2d 1 (2005)
Stephen C. SMITH
v.
TIDEWATER INC.
No. 2004-CA-0195.
Court of Appeal of Louisiana, Fourth Circuit.
March 2, 2005.
Opinion Granting Rehearing August 17, 2005.
*5 David W. Bernberg, David W. Bernberg, APLC, and Stephen R. Barry, Barry & Piccione, APLC, New Orleans, LA, for Plaintiff/Appellee (Stephen C. Smith).
Miles P. Clements, Ann Marie Leblanc, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Defendants/Appellants (Tidewater, Inc., Tidewater Marine, L.L.C. and TT Boat Corporation).
(Court composed of Judge MICHAEL E. KIRBY, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO JR.).
MICHAEL E. KIRBY, Judge.
On April 6, 2000, defendant/appellant Tidewater Marine, L.L.C. employed plaintiff/appellee Stephen Smith as a seaman aboard its tug the Gulf Brent. Early that morning, plaintiff allegedly slipped or tripped on the stern deck of the tug and fell overboard into the ocean approximately three (3) miles off the coast of San Juan, Puerto Rico, where the vessel was headed to deliver its cargo and pick up another cargo on the same barge for a return voyage to Jacksonville, Florida.
Upon seeing the tug disappear into the distance and remaining in the water for hours without rescue, plaintiff eventually began to swim to shore. After nearly twenty (20) hours in the water, plaintiff, who was wearing a life vest, was found ashore by Puerto Rican authorities and taken to a hospital for treatment of minor physical injuries. As a result of this accident, plaintiff claimed he suffered significant injury, including post-traumatic stress disorder (PTSD).
According to the master log of the Gulf Brent, when it left Jacksonville its estimated time of arrival (ETA) in San Juan was 06:00. At approximately 04:15 plaintiff *6 was seen on the tug. At 04:45, other members of the crew shortened the tow without plaintiff's presence, even though this was part of his duty. At about 05:00, two searches of the tug were ordered to find the missing crewman. At 05:15, defendant notified the Coast Guard of the missing seaman.
When the U.S. Coast Guard arrived in the area at 10:00, and after searching for its missing crewman for nearly five hours, defendant suspended its search to take the barge into port. Noteworthy in this regard is that bringing the barge into port at this particular juncture allowed stevedores in Puerto Rico to unload and reload the barge in time for it to set sail on schedule the following day.
Upon disengaging the barge in port, defendant's headquarters ordered the tug to await the arrival of lab technicians for drug testing of its remaining crew. Defendant's decision to drug test the remaining crewmembers detained the Gulf Brent in port approximately three (3) hours, from 11:30 to 14:30.
Defendant, through its employees, argued that it needed to comply with a Coast Guard regulation requiring drug testing and that the lab personnel[1] might not want to go to a pier at night. In Section II of the Report of Required Chemical Drug and Alcohol Testing Following a Serious Marine Incident, there are eight categories covering a range of incidents from death to major loss of property, including loss of a vessel, to discharge of hazardous materials or large amounts of oil. None of these categories was checked as applicable to this incident.
At 14:30 the Gulf Brent was finally released to return to the search for plaintiff. It searched for only a few more hours, until about 18:20 hours before returning to port for defense attorneys to take statements of the crew about the occurrence. From this point onward the crew rested to comply with manning regulations so that they would be able to take the reloaded barge back to Florida on schedule. The Gulf Brent would not thereafter search for its missing crewman.
The Gulf Brent was on its return voyage to Florida when it was notified that plaintiff was located ashore by Puerto Rican authorities. Tidewater's attorney in Puerto Rico, Mr. Jose' Sarraga, took Mr. Smith to eat and then interviewed him about the accident so as to prepare an affidavit. Subsequently, plaintiff was flown back to Florida from Puerto Rico and brought in for questioning by the management of Tidewater. Later Tidewater's towing division manager, Mr. Tom Kazusky, fired the plaintiff for alleged "improper work practices."
After these events surrounding the boating incident, on September 26, 2000, Mr. Smith was in an automobile accident. Another vehicle rear-ended the plaintiff's vehicle.

Action of the Trial Court
At trial, plaintiff pursued several theories of liability against his former employer, including failure to rescue, negligence for the alleged slippery condition of the vessel and unseaworthiness. Plaintiff also maintained that defendant refused to provide him with the required maintenance and cure benefits and that he was wrongfully terminated.
The trial court found that plaintiff failed to carry his burden of proof on the issues regarding Jones Act, 46 Appendix U.S.C.A. § 688,[2] and General Maritime unseaworthiness *7 claims. It also concluded that the doctrine of res ipsa loquitur was not warranted absent a showing of at least a malfunction, failure or misuse of the vessel, or some defect therein. Rabb v. Canal Barge Co., 428 F.2d 201, 203 (5th Cir.1970).
The trial court did find that the defendants violated the duty to rescue and that plaintiff was wrongfully terminated. It awarded general damages of Two Hundred Fifty Thousand ($250,000.00) Dollars to plaintiff and an additional One Hundred Thousand ($100,000.00) Dollars on the wrongful termination claim. Judicial interest on these amounts was awarded from the date of judicial demand.

STANDARD OF REVIEW
Normally, appellate courts review trial court factual findings under the manifest error standard. Nevertheless, when the trial court commits legal error, de novo review is triggered. Tarifa v. Riess, XXXX-XXXX, p. 6 (La.App. 4 Cir. 5/7/03), 856 So.2d 21, 24: Hoskins v. Hoskins, 36,031 (La.App. 2 Cir. 4/5/02), 814 So.2d 773; Guillory v. Wal-Mart Stores, 2001-127 (La.App. 3 Cir. 10/3/01), 796 So.2d 772; Roger v. Dufrene, XXXX-XXXX (La.App. 4 Cir. 9/9/98), 718 So.2d 592. In reviewing the disposition of claims tried under the Jones Act or general maritime law, we apply this same standard. Milstead v. Diamond M Offshore, Inc. 95-2446 (La.7/2/96), 676 So.2d 89. The fact finder has wide discretion in determining damages, and appellate courts should rarely disturb such an award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993).
The defendants assign error on the part of the trial court for: (1) holding defendants liable for failure to rescue considering that the Gulf Brent searched for plaintiff from the moment he was deemed overboard and that it did not cease searching until the Coast Guard arrived; (2) striking defendants' liability expert and excluding Coast Guard records; (3) finding plaintiff proved he suffered a Post Traumatic Stress Disorder ("PTSD") as a result of not being rescued, as opposed to going overboard; (4) holding defendants liable for retaliatory discharge and awarding damages thereon; (5) ruling on evidentiary matters contrary to the law as well as awarding prejudgment interest on future damages.
The plaintiff assigns error on the part of the trial court for: (1) failing to award special damages for lost wages and loss of earning capacity; (2) failing to award special damages for future medical expenses; (3) failing to award general damages for disability.

DISCUSSION:

Duty of Search and Rescue
The central issue is whether the defendant, as master of the vessel, violated either a statutory or jurisprudential duty owed to this seaman who was lost for a period of time. A corollary issue is to what degree, if any, does the commencement of a Coast Guard search lessen the duty a ship owes to its seaman. The answer *8 to this latter question, as elucidated below, is that it does not.
Prior to the time of the Roman Empire the duty to search and rescue a seaman gone overboard was recognized as a natural obligation of the master of the ship. This is due to the fact that there are few other peaceful pursuits in which the dominion of the superior is so absolute and the dependence of the subordinate so complete, as in that of a sailor upon a vessel at sea. A seaman owes obedience while on shipboard to his superior officers and is bound to execute their lawful commands even at the risk of danger to his person or life. If thrown into the sea while aboard he is completely dependent on the members of the crew for immediate aid. 1B Benedict on Admiralty Section 30.
The general maritime law in the United States, which is jurisprudential, recognized a legal duty for a maritime employer to search and rescue his seamen, who are considered "wards" of the admiralty courts. Harris v. Pennsylvania R.R., Co., 50 F.2d 866, 868-869 (4th Cir.1931); Reyes v. Vantage SS Company, Inc., 609 F.2d 140, 143 (5th Cir.1980).
Since the inception of this jurisprudence, however, legislation has been passed regarding the action required when a seaman has gone overboard. We note that when Congress passed the Jones Act, 46 U.S.C.App. § 688, et seq., its motivation was twofold: first, to provide an action to compensate seaman for their injuries; and second, to offer incentives to their employers to reduce dangers and to operate safely. Gaston v. Flowers Transp., 866 F.2d 816, 1989 A.M.C. 1761 (5th Cir.1989).
In 1983, a substantial legislative revision of the United States Code Title 46, entitled "Shipping," recognized the Coast Guard's greater regulatory authority.[3] A central purpose of the United States Coast Guard is to save life. 14 U.S.C.A. § 2. A specific duty to rescue life and property is found in 14 U.S.C.A. § 88.
Nevertheless, the Coast Guard and its regulations do not limit the master of a vessel's duty to search and rescue. Reyes, supra at 142, states:
The affirmative duty to rescue arises as soon as the seaman enters the water, whether by jumping or falling overboard. This is an expansive duty which derives from the seaman's celebrated status as a "ward" of the admiralty: "The contract of employment involves not merely a surrender of the personal liberty of the seaman to a greater extent than is customary, ... but it imposes upon the employer an exceptional obligation to care for the well-being of the crew." Harris v. Pennsylvania R.R. Co., supra at 868, 1931 AMC at 1307.
There are two branches of the maritime rescue doctrine.[4] The first *9 branch is applicable here, where a seaman has apparently fallen overboard but his presence or location in the water is not readily discernible from the ship. 1B Benedict, Admiralty § 30 at 3-255 (6th ed.1976). This search and rescue branch requires the ship's officers to both rescue the seaman and to effect a search of the area traversed by the ship, so long as it is reasonably possible that the seaman remains alive in the water. Reyes v. Vantage S.S. Co., Inc., 609 F.2d 140, 1981 A.M.C. 1255 (5th Cir.1980). This duty is absolute, the only limitation on its application is where the seaman intended to commit suicide:
As there is no substantial suggestion of suicide, it is immaterial whether he carelessly slipped or ... whether a careless bump precipitated him.
Harris v. Pennsylvania R.R., 50 F.2d 866 (4th Cir.1931); Kirincich v. Standard Dredging, Co., 112 F.2d 163 (3rd Cir.1940). As the learned trial court noted in his reasons for judgment:
In 1962, the Fourth Circuit U.S. Court of Appeals stated in Gardner v. National Bank Carriers, Inc., 310 F.2d 284 at 286 [(4th Cir.1962)]:
"The survival of a seaman adrift at sea depends in large measure upon the diligence of those who are required by law to look for him. If they default in their duty, death is made certain. In recognition of this unyielding truth, the admiralty law annexes to a seaman's contract of employment, an obligation on the part of the master to use every reasonable means to save the seaman's life if he goes overboard."
The United States Code of Federal Regulations imposes a duty on the master of a vessel in 46 C.F.R. Section 26.03, which treats the topic of Special Operating Requirements. 46 C.F.R., Section 26.03-2(b) specifically deals with an emergency situation in which a man falls overboard and states that the master of the vessel must notify by radiotelephone the Coast Guard and all vessels in the vicinity and that the search must continue until after another consultation with the Coast Guard, in which the Coast Guard grants permission to terminate the search.
In this case, after searching the ship for the missing seaman, the defendant notified the Coast Guard and commenced a search working back along its course in a corkscrew manner. The defendant continued to search after the Coast Guard was searching. Therefore, we conclude the defendant complied with 46 C.F.R. Section 26.03-2(b).
Another statutory duty on the part of the employer or master[5] of the vessel to take all reasonable measures to search for a missing seaman, and rescue him if found, is under 46 U.S.C.A. § 2304[6], which states in relevant part:
A master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board.
* * *
This statutory duty coupled with the Harris, supra, jurisprudence and its progeny form the standards upon which the master of a vessel's actions in a search and rescue operation are to be judged.
*10 In analyzing whether the defendant complied with its duties, one must ask two questions: (1) Was it reasonable to order the vessel into port after it had searched for five hours with the barge in tow because it was an alleged hindrance; and, (2) Was it reasonable for the ship to remain in port to await lab technicians for drug testing.
Defendant argues that once the Coast Guard began searching, it was reasonable for the Gulf Brent to bring its tow into port, as it created a burden in the search efforts.[7] However, testimony in the record reveals that to unload this barge and reload the barge required about twelve (12) hours. Defendant's argument that the barge was such a burden was not found credible by the trial court because had that been the case the defendant would not have been able to search with the tow for five (5) hours. The trial court chose to believe that the economic incentive of bringing the barge into port so that it could be unloaded and reloaded so as not to lose any time was the motivating factor in the defendant's decision to dock the barge and stop its search for its missing seaman.
Even if one believed defendant's argument that the barge was a hindrance and needed to be disengaged to conduct a more efficient search, then why did defendant spend over three (3) hours in port while its seaman was lost at sea? These actions were anything but diligent disengaging of one's tow in order to return to sea to conduct a more efficient search.
In defense of its actions, Tidewater submitted documents stating that it took over an hour to break tow. We find the trial court to be correct in finding that this was an overestimate of the time required to break tow because its Captain testified this could be done in thirty minutes. Next defendant argues that the ship remained in port for over three hours because it had to comply with 46 C.F.R. § 4.06, which states:
§ 4.06-1 Responsibilities of the marine employer.
(a) At the time of occurrence of a marine casualty, a discharge of oil into the navigable waters of the United States, a discharge of a hazardous substance into the navigable waters of the United States, or a release of a hazardous substance into the environment of the United States, the marine employer shall make a timely, good faith determination as to whether the occurrence currently is, or is likely to become, a serious marine incident.
(b) When a marine employer determines that a casualty or incident is, or is likely to become, a serious marine incident, the marine employer shall take all practicable steps to have each individual engaged or employed on board the vessel who is directly involved in the incident chemically tested for evidence of drug and alcohol use.
(c) The determination of which individuals are directly involved in a serious marine incident is to be made by the marine employer. A law enforcement officer may determine that additional individuals are directly involved in the serious marine incident. In such cases, the marine employer shall take all practicable steps to have these individuals tested in accordance with paragraph (b) of this section.

*11 (d) The requirements of this subpart shall not prevent vessel personnel who are required to be tested from performing duties in the aftermath of a serious marine incident when their performance is necessary for the preservation of life or property or the protection of the environment.
(e) The marine employer shall ensure that all individuals engaged or employed on board a vessel are fully indoctrinated in the requirements of this subpart, and that appropriate vessel personnel are trained as necessary in the practical applications of these requirements.
[Emphasis added.]
However, we note the regulation clearly states that the only people who need be chemically tested are those "directly involved in the incident." Here, the only person directly involved was the plaintiff who went overboard. No one else had an inkling as to the plaintiff's whereabouts, as manifested by the need for two (2) searches of the ship for him, prior to notifying the Coast Guard. Thus, the trial court was correct in finding that even if this test were mandatory, the defendant could have conducted this test later per subsection (d) of this section. Moreover, its discretion in choosing to conduct these tests on the crew is questionable because none of the crew members was "directly involved in this incident."
Defendant further argues these tests were mandatory in order to justify its stay in port for hours. In doing so, Tidewater assumes, first, that the crew was directly involved, and, second, that a missing seaman automatically meets the definition of a "marine casualty or accident" as defined in 46 C.F.R. § 4.03, to wit:
§ 4.03-1 Marine casualty or accident.
(a) The term "marine casualty or accident" shall mean any casualty or accident involving any vessel other than public vessels if such casualty or accident occurs upon the navigable waters of the United States, its territories or possessions or any casualty or accident wherever such casualty or accident may occur involving any United States' vessel which is not a public vessel. (See § 4.03-40 for definition of "Public Vessel.")
(b) The term "marine casualty or accident" includes any accidental grounding, or any occurrence involving a vessel which results in damage by or to the vessel, its apparel, gear, or cargo, or injury or loss of life of any person; and includes among other things, collisions, strandings, groundings, founderings, heavy weather damage, fires, explosions, failure of gear and equipment and any other damage which might affect or impair the seaworthiness of the vessel.
(c) The term "marine casualty or accident" also includes occurrences of loss of life or injury to any person while diving from a vessel and using underwater breathing apparatus.
46 C.F.R. Section 4.03-2 Serious marine incident.
The term "serious marine incident" includes the following events involving a vessel in commercial service:
(a) Any marine casualty or accident as defined in § 4.03-1 which is required by § 4.05-1 to be reported to the Coast Guard and which results in any of the following:
(1) One or more deaths;
(2) An injury to a crewmember, passenger, or other person which requires professional medical treatment beyond first aid, and, in the case of a person employed on board a vessel in commercial service, which renders the *12 individual unfit to perform routine vessel duties;
Defendant assumed incorrectly. It had no way of knowing whether an "injury" had occurred. To the contrary, in its brief, defendant Tidewater argues that it suspected Mr. Smith possibly jumped ship in hopes of an award.
No matter what position the defendant takes, under these facts, the trial court did not commit manifest error in holding that the defendant negligently performed its duty to search. Defendant's conduct in port demonstrates that it violated its 46 C.F.R. Section 4.06(e) duty as the crew and command obviously lacked a proper understanding of what the regulations required. The drug testing of the crew was not necessary under these circumstances and, even if it were it could have been done at a later time. Neither can we say it was manifestly erroneous for the trial court to find that the defendant acted in such a way as to place a higher value on the economics of having its ship remain on schedule than on the life of its seaman.

Causation and Breach of Duty
Because this is a seaman's action, we must look to general maritime law and the Jones Act to determine the burden of proof and causation. At the outset, we note that the burden of proof in a Jones Act or general maritime law case is very slight or featherweight. In re Cooper/T. Smith, 929 F.2d 1073 (5th Cir.1991). One reason for this is the difficulty of proving facts on the high seas, which are inherently dangerous and consuming of evidence.
In the context of the search and rescue doctrine, the Federal Appellate Court has used the Pennsylvania Rule[8] to create a presumption of negligence per se upon a finding of a statutory or regulatory violation such as the one at issue here. Reyes v. Vantage S.S. Co., Inc., 609 F.2d 140, 143 (5th Cir.1980) held:
The failure to follow Any Coast Guard regulation which is a Cause of an injury establishes negligence Per se. In Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 1958 AMC 251, 2 L.Ed.2d 382, an open-flame kerosene lamp was placed on the deck of a scow, rather than at least eight feet above as required by Coast Guard regulation. The regulation was solely for purposes of navigation, not crew or fire safety. The lamp ignited the surface of the river and a seaman abroad [sic] the tug which was towing the scow lost his life. The Supreme Court awarded Jones Act damages and expressly held that the type of Coast Guard regulation violated was irrelevant so long as the violation played any part in causing the injury. See also Neal v. Saga Shipping Co., 5 Cir., 1969, 407 F.2d 481, 1969 AMC 280.
Independently of the Coast Guard and its regulations, the shipowner is charged with the highest degree of diligence to save a seaman who has gone overboard. In this case defendant incorrectly tries to use the regulatory scheme as justification for remaining in port for several hours while its seaman was lost at sea. Moreover, the trial court did not find credible the defendant's argument that it had to return to port after five (5) hours of searching to disengage its barge as it allegedly was a burden. But for the vessel returning the barge to port so that it could remain on schedule, plaintiff may have been rescued and his PTSD lessened.
While we agree that the Coast Guard has authority to search and rescue, *13 the master of a ship may not discharge his duty simply by calling on the Coast Guard. The result of defendant's decision was that the ship was docked at port for hours while the plaintiff was adrift at sea. The defendant certainly could not have found its lost seaman while docked and defendant may have rescued its seaman had they proceeded back out to sea, as at that point in time plaintiff was moving toward the coast of Puerto Rico where defendant was docked. The trial court was not manifestly erroneous in finding it more likely than not that defendant may have rescued the plaintiff before he made it to shore, and lessened the effects of the PTSD.
Moreover, Reyes also stands for the proposition that under the Jones Act, the ship owner's negligence need only be a contributing cause of the injury, it need not be the sole proximate cause to result in liability. Combining this lesser standard of causation with the Pennsylvania presumption of causation in favor of the seaman, the record does not support defendant's assertions that it overcame the burden of proving that its inaction, i.e., spending hours docked while plaintiff was lost at sea, and the ensuing regulatory violation could not have been a contributing cause of the plaintiff's PTSD.[9]

Comparative Negligence and Damages for PTSD
Defendant, offered the testimony of crewmen who found no slipping or tripping hazards after the plaintiff was missing. The weather was good and the seas were calm. George Pittman, plaintiff's co-worker testified he had seen plaintiff sitting on the bulwark during the voyage. Therefore, the trial court was not manifestly erroneous in finding the vessel seaworthy and denying the plaintiff's other Jones Act claims.
At the outset of this analysis of the damages we note a lump sum judgment is presumed to award all items of damages claimed. Bryan v. City of New Orleans, 98-1263 (La.1/20/99); 737 So.2d 696. Here, we conclude the lump sum award of general damages of $250,000.00, includes a specific award for permanent disability. Including this award in this sum makes it reasonable and one we should not disturb. Youn, supra.
We find that the trial court erred in not assessing plaintiff a percentage of contributory negligence and then by not reducing the general damages awarded for failure to search and rescue by this percentage of contributory negligence. As our brethren of the Third Circuit recently stated:
Comparative negligence applies to both unseaworthy claims as well as Jones Act negligence actions. Cormier [v. Cliff's Drilling Co.], [640 So.2d 552] at 556 [(La.App. 3d Cir.5/4/94)]. To prove comparative negligence on the part of the plaintiff, the defendant has to show that the plaintiff was contributorily negligent and that such negligence was a proximate cause of the resulting injury. Miles v. Melrose, 882 F.2d 976 (5th Cir. 1989). The effect of finding negligence on the part of a seaman seeking recovery in a seaworthiness action or Jones Act claim is only to reduce damages proportionately, but not to bar recovery. A seaman's negligence will not defeat his claim under the Jones Act and general maritime law but may be considered as comparative negligence to mitigate damages in proportion to the degree of his negligence. Portier v. Texaco, Inc., 426 So.2d 623 (La.App. 1982), writs denied 433 So.2d 165 (La. 1983); Scott v. Fluor Ocean Services, *14 Inc., 501 F.2d 983 (1974); Griffin v. LeCompte, supra, 471 So.2d 1382 at 1389 (La.1985). Contributory negligence, however gross, does not bar recovery but only mitigates damages. Johnson v. Offshore Exp., Inc., 845 F.2d 1347, (5th Cir.1988), rehearing denied, cert. denied 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (U.S.La.1988).
Aycock v. Ensco Offshore Co., XXXX-XXXX, p. 5 (La.App. 3 Cir. 12/18/02), 833 So.2d 1246, at 1250.
Defendant astutely notes that it is not the sole proximate cause of plaintiff's PTSD because there was no fault attributed to it in plaintiff's falling overboard. Nevertheless, plaintiff argues that defendant's violation of its duty to search and rescue greatly contributed or enhanced his PTSD.
We affirm the trial court's ruling that the defendant was not negligent in the plaintiff's fall into the sea because there is no evidence of any unseaworthy condition aboard the ship. Therefore, plaintiff has comparative fault for allowing himself to fall into sea in the first place because but for his fall, he would not have suffered PTSD. That being said, we now look to the record and case law for guidance in assessing the percentage of fault attributable to the plaintiff for his contributory negligence.
In Walsh v. Zuisei Kaiun, K.K., 606 F.2d 259, 1980 A.M.C. 2788 (9th Cir.1979) a pilot fell into the water when he attempted to jump from the bottom of a rope ladder on the ship's side to a pilot launch. Even though the need for rescue did not arise from any negligence on the part of the ship, the shipowner was assessed one-third (33.3%) of the fault in the death of the pilot. On appeal following remand, in Reyes v. Vantage S.S. Co., 672 F.2d 556 (5th Cir.1982) the court affirmed a finding that the defendant was fifteen percent (15%) at fault in the death of a crew member who was intoxicated and intentionally jumped off the ship. The fault was predicated upon defendant's statutory violation and the unchecked availability of alcohol on the ship.
Using these two cases as guidance and after thoroughly reviewing the record, we assign the plaintiff seventy percent (70%) fault for creating the conditions responsible for the onset of his case of PTSD.

Retaliatory Discharge and Special Damages: Lost Wages and Loss of Earning Capacity
Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057 (5th Cir.1981) created within the general maritime law an action for wrongful or retaliatory discharge. Smith, supra, at 1063-4 stated the elements of such a claim:
In order to prevail the seaman must affirmatively establish that the employer's decision was motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer. The employer may, on the other hand, defeat the seaman's action by demonstrating that the personal injury action was not a substantial motivating factor for the discharge.
The learned trial court's rationale concerning the retaliatory discharge claim is sound and we adopt it:
Following his two week stay and treatment at a Florida hospital after his rescue, the plaintiff was flown to New Orleans where he met with company officials and their attorneys to discuss the accident. Mr. Smith testified that the managers felt that he was not telling the truth, and told him so. Plaintiff indicated that management criticized him for smoking in quarters. Mr. Smith was also advised that after the vessel *15 docked in San Juan, an attorney for defendant went aboard and searched Mr. Smith's belongings and found a multitude of cigarette butts. Mr. Smith acknowledged that he had been warned about smoking aboard the vessel, but that many other crew members also smoked. According to the Personnel Action Form for Termination completed by Mr. Kazusky, the plaintiff was terminated on April 19, 2000 for "improper work practices."
Plaintiff contended that he was wrongfully terminated in retaliation for his potential Jones Act claim against Tidewater. In Smith v. Atlas Off-Shore Boat Service Inc., the U.S. Fifth Circuit Court of Appeal enunciated the legal requirements for a retaliatory termination claim by a seaman:
In order to prevail the seaman must affirmatively establish that the employer's decision was motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer. The employer may, on the other hand, defeat the seaman's action by demonstrating that the personal injury action was not a substantial motivating factor for the discharge.
Plaintiff testified that after being rescued and brought to the hospital, his employer, Tidewater had an attorney interview him and take his statement prior to having any opportunity to rest after his ordeal. In a subsequent meeting with Mr. Kazusky, a manager for Tidewater, on April 19, 2000, Mr. Smith stated he was terminated for smoking in quarters.
Mr. Kazusky, testified that as manager for Tidewater, Inc., it was his decision alone to terminate plaintiff and he did so on the basis of his meeting with the plaintiff on April 19, 2000. Prior to the meeting, Mr. Kazusky stated that he learned that plaintiff had told the press he tripped on lines which he had been handling at the bow of the tug, and yet he told Mr. Sarraga, an attorney for the defendant, and others he didn't know what happened. Mr. Kazusky maintained that there was no tripping or slipping hazards present, and that the crew suspected that plaintiff had been sitting on the bulwarks smoking and fell over. Having reviewed the plaintiff's personnel file which reflected a history of past problems, e.g. smoking violations, Mr. Kazusky suspected that these past problems were recurring based upon his 25 years of experience, his concern for safety and knowledge of the M/V Gulf Brent.
Mr. Kazusky acknowledged that at the April 19, 2000 meeting, he informed the plaintiff that Tidewater did not "feel comfortable not knowing from you what happened and doesn't want it to occur again." Plaintiff's inability to explain what happened prompted Mr. Kazusky to terminate his employment. Mr. Kazusky indicated that had the plaintiff admitted that he was sitting on the bulwark when he fell overboard, Mr. Kazusky would not have fired him but had him undergo safety training and possibly taken corrective action.
Mr. Kazusky testified that what he meant when he wrote "improper work practices" on the Personnel Action Form for Termination, included falling overboard under good conditions (weather, lighting, decks clean, etc.) without explanation, being out on deck at night without being given an assigned task, failing to notify the captain that he was going out on the deck, sitting on the bulwark while underway and creating a fire hazard by smoking in quarters.

*16 The court finds that based upon the evidence and testimony presented at trial, the defendant wrongfully terminated the plaintiff in light of his potential Jones Act claim. Although Mr. Smith had not filed any lawsuit prior to his subsequent rescue and initial interviews with Tidewater attorneys and company representatives, the court finds that the defendant operated in a manner which clearly anticipated the prospect of future litigation by Mr. Smith. Specifically, the court finds the presence and utilization of an attorney to record the statements of the crew as well as the first formal statement by Mr. Smith within an hour of his admission to the hospital, legal steps indicative of a company preparing for possible litigation.
While Mr. Smith clearly had not evidenced the specific intent to file a Jones Act claim during his nearly 20 hours at sea or in the early days following his rescue, his forward thinking employer and its representatives, by their actions in the hours following Mr. Smith's fall overboard and subsequent rescue, manifested their anticipation of future litigation concerning the incident. The court finds that the defendant's reason for Mr. Smith's discharge as set forth in the Personnel Action Form for Termination, i.e., "improper work practices," were a pretext when coupled with the written notes taken by Mr. Kazusky during his meeting with Mr. Smith on April 19, 2000 and the trial testimony elicited from Mr. Kazusky and other witnesses.
With respect to the smoking violation, six out of eight of the crew members, including Captain Banks, smoked, according to testimony elicited from Captain Banks, David Lytle and George Pittman. Captain Banks further acknowledged that the plaintiff had his express permission to smoke. The Tidewater rule or safety regulation prohibiting smoking inside the vessel was broken by the captain himself when he permitted smoking inside the wheel-house.
As for Mr. Smith's alleged breach of the rules and safety regulations of the vessel, the evidence and testimony demonstrated that Stephen Smith went up on deck after dark every night that he was on duty in order to check the winch and tow line, because such checking was an aspect of his job. Captain Banks testified as to his awareness that Stephen Smith routinely performed such checking functions as part of his duties. Moreover, as this alleged rule was never produced in evidence, assuming it had been reduced to writing, this court was not swayed by the defendant's reliance upon same for its dismissal of the plaintiff.
With regard to defendant's dismissal due to negative reports on work performance contained in the plaintiff's personnel file, the court similarly found this reason for termination to be a pretext as the most recent personnel report was positive. The evidence demonstrated that the last negative report was over four years old [1996] at the time of Stephen Smith's firing.
Finally with respect to the concerns about plaintiff's inability to explain how the accident occurred, the court concluded that this "concern" was a substantial factor for his discharge on April 19, 2000. Upon review of the notes made by Mr. Kazusky during his meeting with Mr. Smith on April 19, 2000, the court discerned that the reason for plaintiff's dismissal was an amalgamation of aforementioned reasons, none of which were proven to have attributed to the plaintiff's fall overboard. Thus the court concluded that the defendant sought to improperly penalize the plaintiff by discharging *17 him for an unsubstantiated violation vis-à-vis the April 6, 2000 incident as opposed to Mr. Smith's prior infractions from other voyages.
We find no manifest error in the trial court's ruling on the issue of retaliatory discharge. There is evidence in the record to support a finding that defendant's firing of Mr. Smith was motivated in substantial part by knowledge that Mr. Smith was considering filing a claim. Further, a permissible view of the evidence would be that the defendant did not demonstrate that the future personal injury action was not a substantial factor for the discharge. Finally, of course, the trial court was in the best position to determine the credibility of defendant's witness and manager, Mr. Kazusky, as well as his motivation for firing plaintiff.
There is evidence in the record of plaintiff's mental anguish that he suffered as a result of his retaliatory discharge. There is also testimony concerning plaintiff's jobs and their pay after the accident. The record shows the difference in wages between an able bodied seaman and an employee at Papa John's Pizza. They are substantial.[10]
We note here that the trial court Judgment amalgamates special damages, i.e., lost wages and loss of future earning capacity, together with the losses attributable to the retaliatory discharge claim. Thus, although the trial court did not offer a break down of the award, considering the amount awarded in Smith v. Atlas Offshore Boat Service, Inc., 552 F.Supp. 128, 129-30 (S.D.Miss.1982), which was greater than $21,000.00, adjusting it for inflation and adding a reasonable award for lost wages and loss of future earning capacity, we cannot say that this award is manifestly erroneous. Therefore, we affirm the trial court's award of one hundred thousand dollars ($100,000.00) for his wrongful termination claim and amend the judgment to denote that the award is a lump sum which includes an award for lost wages and loss of future income.

Prejudgment Interest
We review a grant or denial of prejudgment interest for abuse of discretion. Brister v. A.W.I., Inc., 946 F.2d 350, 1993 A.M.C. 1990 (5th Cir.1991); Simeonoff v. Hiner, 249 F.3d 883, 2001 A.M.C. 1778 (9th Cir.Alaska 5/8/2001).
Prejudgment interest may not be awarded on a judgment for future damages, as it amounts to a double recovery. Boyle v. Pool Offshore Co., a Div. of Enserch Corp., 893 F.2d 713, (5th Cir.1990), 29 Fed.R.Evid. Serv. 984; Martin v. Walk, Haydel & Associates, Inc., 794 F.2d 209, 212 (5th Cir.1986). Here the trial court awarded plaintiff $250,000 in general damages for PTSD.
Plaintiff was 48 when he filed suit and his life expectancy was to the age of 78. Thus, plaintiff's future suffering with PTSD would be 30 years (at judgment date, he was 51 and his life expectancy was still to the approximate age of 78). On the basis of his award of a permanent PTSD, only ten (10%) percent of his alleged PTSD damages had accrued when judgment was entered. Therefore, we amend the Judgment of the trial court to award prejudgment interest only on ten percent (10%) of the plaintiff's general damage award from the date of judicial demand and judicial interest on the balance from the date the judgment was entered on October 30, 2003.
*18 As concerns the prejudgment interest on the one hundred thousand dollar award we deny it because it was an abuse of discretion to award prejudgment interest for both lost wages and future loss of income without itemizing. In this case without an itemization, we cannot ascertain what the trial court awarded for lost wages and for future loss of income.

Evidentiary Rulings
Insofar as excluding Dr. Ginzburg's testimony and Drs. Mitchell and Pham, who treated the plaintiff after an unrelated automobile accident, we find no abuse of the trial court's discretion. We also find defendant's argument disingenuous that it was unaware plaintiff was making a failure to rescue claim from the plaintiff's petition.

Unawarded Special Damages for Future Medicals
Under Louisiana law, "[f]uture medical expenses must be established with some degree of certainty. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable costs." Duncan v. Kansas City Southern Railway Co., XXXX-XXXX (La.10/30/00); 773 So.2d 670. Dr. George M. Joseph, plaintiff's treating psychiatrist, did state in reference to the plaintiff that:
I would say that he is probably currently doing about as well as he's going to do. I think he will have some chronic post traumatic elements concerning water, which will erupt from time to time, both in the form of disturbing dreams or memories. I think he will, on exposure to large bodies of water, have problematic symptoms as I just mentioned.
The plaintiff had a complicated medical history and the fact that the trial court did not award future medicals is a permissible view of the evidence contained in the record.

Specific Damages for Disability
As stated supra in this opinion, an award for the specific damage of permanent psychiatric disability is included in the general damage award. The failure to itemize permanent disability in a general damage award does not constitute an abuse of discretion or require modification of the award. Harper v. Falrig Offshore, Inc., 2000-694 (La.App. 3 Cir. 12/20/00); 776 So.2d 620, 631, 632.

CONCLUSION
For the aforementioned reasons, the trial court Judgment is amended to cast the plaintiff seventy (70%) percent comparatively at fault for his falling overboard. Insofar as plaintiff was awarded $250,000.00 in general damages for PTSD, we amend the judgment to award interest on ten percent (10%) or on $25,000.00 of that award from date of judicial demand and judicial interest on the balance from the date of judgment. The award for retaliatory discharge is amended to properly reflect the intention to include an award for lost wages and loss of future income, the total of which remains the same, i.e., one hundred thousand dollars ($100,000.00) and is awarded with interest from date of judgment.
JUDGMENT AMENDED AND AFFIRMED.
CANNIZZARO, J., dissents in part, with reasons.
CANNIZZARO, J., dissents in part, with reasons.
I respectfully dissent from the majority opinion insofar as it affirms the trial court judgment on the retaliatory discharge claim.
Generally, a maritime employer may discharge a seaman for good cause or for no *19 cause. However, in Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057 (5th Cir.1981), the Court recognized that a discharge in retaliation for the seaman's exercise of his legal right to file a personal injury action against the employer constitutes a maritime tort. As to proof of retaliatory discharge, the Atlas Court specified that it is the seaman's burden to affirmatively establish that the employer's decision was motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer. The employer, on the other hand, may defeat a seaman's retaliatory discharge claim by demonstrating that the personal injury action was not a substantial motivating factor for the discharge. Atlas properly characterized an employer's retaliatory discharge as "an intentional tort," and squarely placed the burden of proving the employer's subjective intent on the seaman. 653 F.2d at 1063-1064.
In Atlas, the plaintiff suffered an ankle injury at the end of a two-week work shift. Six weeks later he was declared fit for duty by his physician and returned to work on another Atlas vessel, and worked a full two-week shift. During the plaintiff's time off, his attorney notified Atlas that the plaintiff intended to file a personal injury claim. Upon returning to work for another two-week shift, the Atlas port captain informed the plaintiff that, "unless he abandoned his personal injury claim, he could not return to work for Atlas." When the plaintiff refused to abandon his claim, the port captain terminated his employment. Later, Atlas admitted in a hearing that the plaintiff had been fired due to his personal injury claim.
In the instant case, Mr. Smith filed suit after Tidewater terminated him. However, unlike the plaintiff in Atlas, Mr. Smith offered no proof whatsoever that Tidewater's decision to terminate him was motivated in substantial part by its knowledge that he intended to file suit. Mr. Smith testified at trial that he did not know why he fell overboard. He described his meeting with Tidewater management two weeks later at its office in Amelia, Louisiana. Specifically, he testified that he met with Mr. Tom Kazusky, manager of Tidewater's towing division, and told him that he really did not know what had happened to make him fall overboard. He testified that Tidewater's management told him "we think you are lying Steve," about the incident and then terminated him. He admitted that smoking in quarters was a violation of Tidewater's safety policy and that he had smoked in quarters more than once on the voyage in question. According to Mr. Smith, that was the extent of the meeting. Notably, Mr. Smith admitted that he never mentioned anything about filing a personal injury claim at the meeting and that, in fact, he hid not have a lawyer at that time.
Mr. Smith's only other evidence relevant to his alleged retaliatory discharge claim was the fact that Tidewater asked Mr. Jose Sarraga, an attorney, to interview the crew of the M/V GULF BRENT in Puerto Rico, to determine what had happened. The record reflects that the day after Mr. Smith came to shore, Mr. Sarraga met with him that afternoon at his hotel. According to Mr. Smith, Mr. Sarraga wanted to know what had happened and he also assisted him in getting through immigration and making flight arrangements back to the United States. There was no discussion between them of a personal injury claim.
The trial court found that Mr. Smith was discharged for an "amalgamation" of performance  related reasons, and that his inability to explain how the accident occurred was a "substantial factor for his *20 discharge." Indeed, the court cited Mr. Smith's own testimony that "he was terminated for smoking in quarters," and found that "creating a fire hazard by smoking in quarters" was one of the "improper work practices" for which Mr. Kazusky terminated Mr. Smith. Other improper work practices noted by the court as reasons for the termination included "falling overboard under good conditions (weather, lighting, decks cleaned, etc.) without explanation, being out on deck at night without having an assigned task, failing to notify the captain of going out on deck, sitting on bulwarks while underway." Clearly, none of the reasons for which the trial court found Tidewater discharged Mr. Smith are retaliatory. It is immaterial that the court determined some of Tidewater's safety regulations, e.g., smoking rules, were inconsistently applied to the seaman. The fact remains that Mr. Smith's violation of his employer's safety policy provided a basis for his termination. More important, Tidewater had an absolute right to know what happened the night of the incident in order to protect its employees and to prevent a similar occurrence in the future. Mr. Smith's failure to give Tidewater an explanation, alone, was a sufficient ground to support his discharge. I also note that the trial court specifically found that Mr. Smith had not evidenced the specific intent to file a Jones Act claim in the days following his rescue. Thus, the question arises, when did Tidewater learn that Mr. Smith intended to file his claim? Mr. Smith put forth no evidence at trial to answer this question. Absent such evidence, Mr. Smith did not satisfy his burden of proof on the retaliatory discharge claim.

ON APPLICATION FOR REHEARING
We grant rehearing to address two issues raised by plaintiff but we adhere to our disposition on original hearing. First, plaintiff claims that we erred in assigning him comparative fault where, without explanation, he fell off a vessel that was found to be a reasonably safe place to work. In his second point he asserts we shifted from the defendant to him the burden of proof on the comparative fault issue.
Plaintiff's recovery in the trial court was based upon the fact that after he fell overboard, his Post Traumatic Stress Disorder ("PTSD") was worsened by the lack of diligence in defendant's search. The duty to search and rescue is independent of the Jones Act and is found in the General Maritime Law ("GML") as laid out in Reyes v. Vantage SS Company, Inc., 609 F.2d 140 (5th Cir.1980) which we followed in determining whether the duty to search was satisfactorily executed. As in Reyes, the plaintiff in this case was at fault[1] in falling overboard because the vessel was seaworthy and plaintiff could offer no explanation as to how or why he fell overboard. Plaintiff did not meet his burden of proof that defendant was in any way at fault in his falling overboard.
Plaintiff cites F.E.L.A., 45 U.S.C.A. § 53:
In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such *21 employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.
Plaintiff argues that this statute applies for two reasons: first, because he classifies his cause of action and recovery under the Jones Act[2] and not the GML; second, he argues that the employer's improper application of the Coast Guard regulations is deemed a violation of a statute enacted for the safety of employees and that violation contributed to the plaintiff's PTSD. Therefore, he contends, a finding of contributory negligence on the part of the plaintiff is prohibited because the Jones Act incorporates F.E.L.A..
To support this proposition he cites Kelly v. Keystone Shipping Company, 281 F.Supp.2d 313 (D.Mass.2003), a district court case out of Massachusetts. Kelly in turn relies on Pratico v. Portland Terminal Co., 783 F.2d 255 (1st Cir.1985). The essence of Kelly and Pratico is that the violation of any safety regulation, will trigger FELA's bar on comparative fault and result in a finding of negligence per se. We note, however, that there is no consensus on this point. Numerous courts have limited, disagreed with and declined to follow this rationale. See: Ries v. National R.R. Passenger Corp., 960 F.2d 1156 (3rd Cir.1992); Scott v. Matlack, Inc., 39 P.3d 1160 (Colo.2002); Brady v. Ralph M. Parsons Co., 327 Md. 275, 609 A.2d 297 (1992); Canape v. Peterson, 878 P.2d 83 (Colo.App.1994); Castine Energy Const., Inc. v. T.T. Dunphy, Inc., 2004 ME 129, 861 A.2d 671; Elliot v. S.D. Warren Co., 97-1848 (1st Cir.1998), 134 F.3d 1.
The Magistrate Judge in Kelly offered scant facts in crafting his holding; we glean from the opinion, though, that the damage resulted from a stomach ailment. The statutory violation was a type of medical malpractice at sea, thereby making the ship unseaworthy for not providing a safe place in which to work. The fact-finder found a direct causal relationship between the violation and the injury due to the unsafe work environment.
This case is distinguished from Kelly in two ways. First, here the cause of action sounded in the GML doctrine of search and rescue, as interpreted in Reyes, not the Jones Act. Second, plaintiff cites no case and, we have been unable to find one ourselves, where FELA applied in a search case. We decline to extend the bar of comparative fault to these facts where, but for plaintiff's own negligence, this accident would not have occurred to begin with. Defendant's improper timing of the drug test did not "contribute" (as used in 45 U.S.C.A. § 53) to Plaintiff's PTSD.
As interpreted in the seminal case of Carter v. Chicago, R.I. & P. RY. CO., 179 Okla. 292, 65 P.2d 469 (1937), FELA created an absolute duty "to provide employees a reasonably safe place in which to work." In this case, defendant clearly proved that the vessel was a reasonably safe place in which to work. To bar an assessment of comparative fault to a maritime employee whose employer does provide a reasonably safe workplace, would be contrary to FELA's purpose.
In Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) a seaman died when his tugboat caught fire because an open-flame kerosene lamp ignited highly inflammable vapors *22 on the surface of the Schuylkill River. Although a Coast Guard regulation required that such lamps be placed at a height of at least eight feet above the water, the trial court found the lamp was located on the deck not more than three feet above the water. The Supreme Court held that this violation of a navigational statute resulted in negligence per se.
We distinguish Kernan because this is a GML duty to search and rescue case and not a Jones Act case. Also, here the causal connection between the improper timing of the crew's drug testing is so attenuated from the cause of plaintiff's PTSD that to apply the bar to comparative fault would over-extend a maritime employer's liability.
Jones v. Spentonbush-Red Star Company, 155 F.3d 587, 1999 A.M.C. 324 (2nd Cir.1998) held that an employer-tugboat operator's violation of a regulation[3] did not constitute negligence per se, did not shift burden of proof to require employer to prove that its statutory violation could not have caused plaintiff-seaman's accident, and did not bar finding of comparative negligence, because doing so would impermissibly enlarge, diminish, or affect the liability of maritime employers.

BURDEN OF PROOF AND CAUSATION
We followed the majority's opinion in Reyes concerning standard of proof and causation. The majority there did not distinguish between the burden of proof and causation found in GML which differs from that of the Jones Act. The GML follows the common law rules governing causation, but the Jones Act has a different, lesser, standard created by statute and jurisprudence. Gavagan v. United States, 955 F.2d 1016, 1992 A.M.C. 2447 (5th Cir. 1992); Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1990 A.M.C. 1214 (5th Cir. 1988).
In this case, plaintiff's PTSD damages were not caused by an unsafe work environment, but rather by plaintiff's unexplained fall into the water. Plaintiff's recovery is based upon a less than diligent fulfillment of defendant's duty to search. The trial court affirmatively found a causal relationship between defendant's less-than-diligent search resulting in plaintiff spending more time in the water, thereby exacerbating his PTSD. The questions on appeal were whether defendant would have found plaintiff had it maintained a diligent search, and whether this would have lessened plaintiff's PTSD.
It was because we shifted the burden of proof to the defendant that we affirmed the trial court's expansive maritime employer liability. Nevertheless, even with the burden of proof shifted to the defendant, the defendant proved that it provided a safe workplace aboard the M/V Gulf Brent. Therefore, our assessment of fault was proper, and guided by the applicable case law.
For the reasons stated above we adhere to the views expressed in our original opinion.
REHEARING GRANTED, JUDGMENT AMENDED, AND AFFIRMED.
CANNIZZARO, J., concurs in the granting of rehearing; dissents from adherence to original opinion.
CANNIZZARO, J., concurs in the granting of rehearing; dissents from adherence to original opinion.
I agree with the majority to grant rehearing in this matter, but for different *23 reasons, and dissent from its adherence to our original opinion rendered on March 2, 2005.
I stand by my dissent from the original opinion insofar as it affirmed the trial court judgment on the retaliatory discharge claim because I find that Mr. Smith did not satisfy his burden of proof on that claim. Furthermore, upon reconsideration of the record, I now disagree with the majority's conclusion and I find that the trial court erred in determining that Tidewater negligently performed its duty to search.
The record reflects that Mr. Smith was last seen on the tug at 4:15 A.M. At 4:45 A.M., he failed to appear to assist the other crewmen in shortening the tow. At 5:00 A.M., two searches of the tug were ordered to find Mr. Smith. When those searches proved unsuccessful, Tidewater notified the U.S. Coast Guard at 5:15 A.M. to search for the missing seaman. Tidewater continued to search for Mr. Smith for nearly five hours, working back along its course in a corkscrew manner with the barge in tow. When the Coast Guard arrived at the scene at 10:00 A.M., Tidewater continued to search for a period of time and then decided to bring the tow into port as it created a burden in the search effort.
The majority and the trial court erroneously conclude that Tidewater was negligent for going into port to release its tow and then remaining in port to conduct drug tests on the crew while Mr. Smith remained lost at sea. I disagree and submit that the Coast Guard was much better equipped to conduct the search and rescue effort than was Tidewater. Additionally, nothing in the record indicates that Mr. Smith would have been found sooner had Tidewater not gone into port to release its tow or had it returned to resume searching. If Tidewater had exhibited an unreasonable delay in contacting the Coast Guard or had it gone into port to release its tow prior to the Coast Guard's arrival or had it not made any effort to search for the missing crewman, then it would have been negligent. Tidewater did none of these. Thus, I disagree with the majority's finding that Tidewater's "less than diligent search" resulted in Mr. Smith's spending more time in the water, thereby exacerbating his post traumatic stress disorder. Notably, the majority correctly states on page five (5) of its opinion on rehearing that "plaintiff's PTSD damages were not caused by an unsafe work environment, but rather by plaintiff's unexplained fall into the water." Hence, had Mr. Smith not fallen overboard, Tidewater never would have had to conduct a search and rescue effort.
In summary, I vote to grant rehearing to reconsider our original opinion. Upon reconsideration, I would reverse the judgment of the trial court in favor of Mr. Smith and dismiss his suit against Tidewater.
NOTES
[1] The lab personnel and drug test were performed by Lab Clinico Miramar.
[2] Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
[3] H.R. 98-338, at 936 (1983), P.L. 98-89 PARTIAL REVISION OF TITLE 46, U.S.C. `SHIPPING' House Report No. 98-338. The Legislative History states that "[t]he Representative of the Seamans International Union testified in support of the manner in which the revision was being conducted and in the committees response to concerns they had expressed, but pointed out that they still had a few concerns with the bill with respect to the revisions of seaman protection laws. The representative of the National Maritime Union testified that several provisions in H.R. 2247 eliminated or decreased some of the protections and rights of seaman [sic] found under existing law, and for that reason opposed the bill. The most general objection of the union representatives was regarding the replacement of specific legal inspection standards with increased regulatory authority for the Coast Guard."
[4] The second branch applies only when the seaman is seen falling from the ship by the crew.
[5] 46 U.S.C.A. § 10101, defines master as the individual having command of a vessel.
[6] The predecessor of this section, 46 U.S.C.A. § 728 (Repealed) was entitled, "Duty of master to assist persons in danger."
[7] The tow named the Barge Jax San Juan Bridge is 738 feet long by 105 feet wide, weighed 35,086 tons and extended above the water approximately four stories, and was subject to wind force.
[8] The Pennsylvania, 86 U.S. 125, 136, 19 Wall. 125, 22 L.Ed. 148 (1873), holds that a statutory violation creates a presumption of negligence.
[9] See 1B Benedict on Admiralty §§ 26 and 30.
[10] We take judicial notice of the fact that although we did not find specific references to plaintiff's wages as a short order cook at the Waffle House, they would be comparable to those of Papa Johns as the jobs are both in the food service industry.
[1] In Reyes, the plaintiff fell overboard and drowned because he was drunk.
[2] In dicta we did state in our original opinion that 46 U.S.C.A. § 2304 provides a standard. Nowhere did we state that defendant violated this standard. We only found defendant did not satisfactorily comply with 46 C.F.R. § 4.06.
[3] The Spentonbush-Red Star Co. violated an Occupational Safety and Health Administration regulation.